Docket No. 79483–Agenda 2–May 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARTIN M. WOOLLEY, Appellant.

Opinion filed September 25, 1997.

JUSTICE BILANDIC delivered the opinion of the court:

The defendant, Martin M. Woolley, was charged by indictment in Henry County with six counts of murder (720 ILCS 5/9–1(a)(1), (a)(2), (a)(3) (West 1994)), one count of armed violence (720 ILCS 5/33A–2 (West 1994)), one count of armed robbery (720 ILCS 5/18–2(a) (West 1994)), one count of robbery (720 ILCS 5/18–1(a) (West 1994)), and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24–1.1(a) (West 1994)), arising out of the February 20, 1995, shooting deaths of Rane Baldwin and Dianna Turley in Kewanee, Illinois. After a jury trial, the defendant was found guilty on all counts. The circuit court entered judgment on two counts of intentional murder, one count of armed violence, one count of armed robbery, and one count of unlawful possession of a weapon by a felon. A capital sentencing hearing was held before the same jury. The jury found the defendant eligible for the death penalty on the basis of three statutory aggravating factors. 720 ILCS 5/9–1(b)(3), (b)(6), (b)(11) (West 1995). The jury further found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the circuit court sentenced the defendant to death. The circuit court also sentenced the defendant to concurrent terms of 30 years' imprisonment on the armed violence conviction, 30 years' imprisonment on the armed robbery conviction, and 5 years' imprisonment on the unlawful possession of a weapon by a felon conviction. The defendant's death sentence has been stayed pending his direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

For the reasons that follow, we affirm the defendant's convictions for murder, armed robbery and unlawful possession of a weapon by a felon. We vacate the defendant's conviction and sentence for armed violence. We also vacate the defendant's death sentence and remand for a new capital sentencing hearing.

FACTS

At approximately 10 p.m. on February 20, 1995, the bodies of Rane Baldwin and Dianna “Dee” Turley were found in Phylly's Cue and Brew tavern (Phylly's) in Kewanee, Illinois. Peter Dolieslager, Baldwin's boyfriend, testified that he called the tavern at approximately 9:45 p.m. and talked to Baldwin, who was tending bar. Dolieslager arrived at the tavern shortly thereafter and discovered the bodies of Baldwin and Turley lying on the floor.

Autopsies revealed that Turley had been shot once in the forehead from a distance of less than three to four feet. The bullet entered Turley's head at a slightly upward angle. Baldwin had been shot three times in the head. The pathologist who conducted the autopsies could not determine the order in which the three bullets struck Baldwin. One bullet struck her right cheek and would not have been fatal. A second bullet entered her head and lodged in her spine, and would have caused instant paralysis but not instant death. A third bullet entered the right side of her head and would have killed her instantly. None of the bullets which struck Baldwin were fired at close range.

 The State presented testimony from several witnesses that both the defendant and his wife, Marcia Woolley, were frequent patrons of Phylly's and that they were present at the tavern throughout the day of February 20, 1995. According to these witnesses, the defendant and his wife arrived at the tavern at approximately 1 p.m. During the afternoon, they drank beer and talked with other patrons. The Woolleys left the tavern at approximately 5 or 5:30 p.m. to go home and prepare dinner for Marcia's children. They returned to the tavern around 6 p.m. and spent the evening drinking beer, talking, and playing pool with Jeff Ince and Debbie Brose. Ince was a bartender at Phylly's and had been working until 7 p.m., when he was relieved by Baldwin.

Brose testified that while the group was playing pool, sometime between 8 and 8:30 p.m., she saw the imprint of a gun under the defendant's shirt stuck in the back of his pants. Neither Ince nor Brose saw the defendant move a gun from his pants to his jacket pocket while they were at the tavern. Dee Turley and Kathy Kouris arrived at Phylly's at approximately 8:30 p.m. Ince and Brose left the tavern at 9:15 p.m. Remaining in the tavern at that time were the defendant, his wife, Turley, Baldwin, Kouris and Rick Van Waes.

Ince testified that, on the evening of the murders, the defendant made a comment to him that he was the type of person who “could walk into McDonalds and just open up on everybody.” Dolieslager testified that he had a conversation with the defendant in Phylly's on February 18, 1995, in which the defendant commented that it would be easy to commit a robbery if you killed the witnesses. Dolieslager admitted that he never mentioned this statement to the police when he was questioned after the murders. Dolieslager also testified that on February 18, 1995, while he and the defendant were in Phylly's, the defendant and Baldwin discovered that they had attended school together and they engaged in a lengthy conversation. The defendant's wife, who was also present, became jealous and was “visibly upset” that the defendant and Baldwin were talking.

On February 21, 1995, the defendant and his wife voluntarily went to the Kewanee police station for questioning. The defendant told investigators that he and Marcia had been at Phylly's the day before but had left at 9:25 p.m. He denied any knowledge of the murders. Beginning at approximately 7 p.m., the defendant was interrogated by Kewanee Police Detective Joseph Cervantez and Illinois State Police Lieutenant Richard Shannahan. During this interrogation, the officers left the room briefly and, upon returning, informed the defendant that they “had him.” According to the officers, the defendant stated that he wanted an attorney and then said, “I killed them, yeah, I killed them.” The defendant subsequently withdrew his request for an attorney and gave a statement regarding the murders. More detailed testimony concerning this sequence of events was presented during the hearing on the defendant's motion to suppress his confession. That testimony is discussed in conjunction with our analysis of the suppression issue.

The defendant filed a motion to suppress his confession, which was denied, and the confession was admitted into evidence. The defendant stated therein that he and Marcia were at Phylly's during both the afternoon and the evening of February 20, 1995. They arrived for the evening at around 6:30 or 7 p.m. At that time, Rane Baldwin was tending bar and Jeff Ince and Debbie Brose were present in the bar. The defendant and Marcia were both drinking beer and playing pool with Ince and Brose. Dee Turley and Kathy Kouris arrived at Phylly's at around 8:30 or 9 p.m. Ince, Brose and Kouris left at approximately 9:30 p.m. At this time, Turley, Marcia, and the defendant were sitting, in that order, on bar stools along the bar. The defendant stated that he decided to rob the tavern. He had been carrying a 9-millimeter gun in the back of his pants. He pulled out the gun and shot Baldwin two or three times in the head, causing her to fall to the ground. He then shot Turley once in the head, causing her to fall. Turley was standing when the defendant shot her and Marcia was sitting on a bar stool between the defendant and Turley. The defendant related that he looked out the front window of the tavern and then walked around behind the bar and took the money out of the cash register and two money bags from underneath the register. At that time, Baldwin moved or made a noise and the defendant shot her again in the head. The defendant then grabbed Marcia and dragged her out of the bar. They got into a pickup truck they had borrowed from a friend and drove home. The defendant took the cash out of the money bags and burned the bags and their remaining contents in a wood stove. He hid the cash in a hole in the wall of a bedroom closet and put the gun in a freezer located in his friend Carl Girkin's garage. The next day, the defendant asked Girkin to throw the gun into a river. The defendant stated that Marcia did not handle the gun that evening and that she had no prior knowledge of what he was going to do.

Lieutenant Shannahan testified that the physical evidence at the crime scene was consistent with the version of events given in the defendant's statement. On cross-examination, Lieutenant Shannahan testified that he did not perform any tests on the defendant's hands to determine if he had recently fired a gun. Lieutenant Shannahan stated that the gunshot residue test is antiquated and unreliable.

Carl Girkin was called by the State and testified that on February 21, 1995, the defendant told him he had put a gun in the freezer in Girkin's garage. The defendant asked Girkin to dispose of the gun by throwing it into the river. Girkin, however, kept the gun because there was nothing wrong with it and he enjoys firearms. Girkin took the gun out of the freezer and put it in a dresser drawer at his girlfriend's house. Kewanee police later recovered the gun from that location. Forensic testing revealed that bullets and spent shell casings recovered from the murder scene were fired from this gun.

Illinois State Police officers recovered $287.25 in cash from a hole in the wall of a bedroom closet in the Woolleys' house. Fingerprints lifted from the currency matched those of the defendant.

Illinois State Police crime scene technician Mike Ogryzek examined the murder scene and formulated a reconstruction of the crimes. Turley's body was found lying on the floor with her ankle resting on the bottom of a bar stool. Ogryzek opined that Turley was shot at close range, from between three to six feet away, and that she was sitting on a bar stool when she was shot. Baldwin's body was located on the floor behind the bar. Ogryzek testified that the bullet to Baldwin's cheek would have caused her body to spin and the bullet that lodged in her spine would have caused immediate paralysis and caused her to fall to the floor. In his opinion, the shooter of these two shots was located in the southwest corner of the bar and could have been coming out of the men's bathroom. Ogryzek further testified that, at the time the third bullet entered Baldwin's head, her head was in contact with some hard surface, such as the floor. In his opinion, this shot was fired while Baldwin was lying on the floor by someone standing over her. Ogryzek testified that the shooter of this shot could not have been standing on a bar stool on the other side of the bar because of the distance across the bar and the angle of the shot.

The State also called Donald Tomsha. In March of 1995, Tomsha was incarcerated with the defendant at the Henry County jail while the defendant was awaiting trial. Tomsha had been convicted of burglary in 1993 and possession of a controlled substance in 1994. When he met the defendant in jail, Tomsha had been charged with burglarizing three businesses. Tomsha subsequently pled guilty to those burglaries and received a sentence of six months in jail and probation.

Tomsha testified that the defendant confessed to him that he had shot and killed the victims. The defendant told Tomsha that he shot the bartender as she was turning up the volume on the television at the defendant's request. The defendant then handed the gun to his wife to shoot Turley, but Marcia “froze” and the defendant took the gun back and shot Turley himself. The defendant took money from the cash register, then shot the bartender again because she was still alive. The defendant told Tomsha he gave the gun to a friend who was supposed to throw it into a river. Tomsha stated that the defendant wrote all of this down on a legal pad and signed it in Tomsha's presence. According to Tomsha, the defendant also wrote several other statements, including one containing an exculpatory version of the events at Phylly's. Tomsha took the documents the defendant had written and turned them over to the authorities. These statements were admitted into evidence at trial.

Tomsha stated that he was not testifying in exchange for favorable treatment and he did not expect any benefit as a result of his testimony. Tomsha agreed, however, that it was “possible” that his providing this information about the defendant to the authorities helped him to avoid prison on his own charges.

Tomsha and the defendant both submitted handwriting samples. FBI Document Examiner John Sardone, a handwriting expert, testified that the defendant's samples were written in a deliberate manner and did not contain his naturally occurring handwriting. Because of the deliberate nature of the defendant's samples, Sardone could not positively identify the defendant as the author of the written statements turned over to the authorities by Tomsha. Sardone was able to conclude that all of these documents were written by the same person, and that they were not written by Tomsha. Sardone also concluded that the signatures on the documents matched the defendant's signature in the known samples.

The State introduced the defendant's prior conviction for burglary and then rested its case.

The defendant testified on his own behalf. He stated that he and Marcia went to Phylly's at approximately 1 or 1:30 p.m. on February 20, 1995. The defendant had stuck his gun in the back of his pants because they planned on doing some target shooting that afternoon. Both he and Marcia were drinking beer. They left the bar at around 5 p.m. to prepare dinner for Marcia's children and returned to the bar afterwards. He and Marcia played pool and continued to drink beer. Dee Turley and Kathy Kouris arrived at the bar at around 8 or 8:30 p.m. Marcia was very jealous of other women having contact with the defendant and had been carrying a grudge against Turley for a long time. Marcia, Turley, and Kouris each drank shots of alcohol, with Marcia consuming two or three shots. When Kouris left the bar, Marcia and Turley were bickering.

At around 10 p.m., the defendant went to the men's bathroom to smoke some “one-hitters” of marijuana. At this time, his gun was in the pocket of his coat which was draped over the back of a bar stool. While he was in the bathroom, he first heard Baldwin raise her voice about something and then heard two or three gunshots. When he came out of the bathroom, he saw Marcia with one foot up on a bar stool leaning over the bar with the gun. Marcia then fired another shot. Turley was already lying on the floor. Marcia was sitting on her bar stool in a daze and the defendant took the gun from her. The defendant looked out the door to see if anyone heard the shots. He then walked around the bar and saw Baldwin lying on the floor behind the bar. The defendant decided to try to “cover things up” by making it look like a robbery. He took the money out of the register and the money bags from underneath the register. He then grabbed Marcia and they left the bar. They went home, where the defendant proceeded to hide the money and burn the money bags. He later put the gun in his friend's garage.

The defendant testified that he and Marcia discussed what their “story” would be if questioned by the police. The defendant told Marcia that, “if it came down to it,” she should tell the police that he committed the murders. Sometime the next day, the defendant told Carl Girkin to dispose of the gun. The defendant ultimately gave a statement to police confessing to the crimes because he was trying to prevent Marcia from being taken away from her children. He was not thinking about the severity of the punishment at that time.

The defendant testified that he became acquainted with Donald Tomsha in jail. Tomsha was very nervous about the prospect of going to prison. The defendant stated that he never spoke to Tomsha about his case. The defendant did, however, have all the documents regarding his case, including police reports, interviews, and discovery, in his cell, where any other inmate could look at them. The defendant did not write any of the documents Tomsha attributed to him.

The defendant denied making a statement to Pete Dolieslager about “killing all the witnesses” in order to get away with a robbery. He also denied ever making the comment about “opening up in a McDonalds” attributed to him by Jeff Ince. When he and Ince had this conversation, it was a conversation about crime generally and the defendant simply commented on how that sort of thing is happening now. The defendant also denied ever making comments to Dave Aldred to the effect that the Kewanee police were a “joke” and it would be easy to commit a crime in Kewanee. The defendant further testified that Marcia had previously worked at Phylly's and that, as a result, he knew that the largest amount of cash was present at the bar on Thursday nights, not on Monday nights, which was the night the murders occurred. The defendant denied that he intended to rob Phylly's or that he shot Baldwin or Turley. The defendant stated that he had frequently seen people reach over the bar to grab a bottle of beer.

On cross-examination, the defendant denied having financial problems, but admitted that business at his tattoo shop was slow and he was behind in the rent. The Woolleys' only income came from the tattoo shop. He also conceded that Monday nights at Phylly's were generally less crowded. When the defendant went into Phylly's on the afternoon of February 20, 1995, he took the gun into the bar because he did not want to leave it in the truck. When he returned to Phylly's after going home at dinnertime, the gun was in his coat pocket. The defendant admitted he had no intention of target shooting in the evening because it was already dark.

The defense also presented the testimony of Kewanee Police Detective Kenneth Ince. Detective Ince testified that he took a statement from Marcia Woolley on February 21, 1995. In that statement, Marcia stated that the defendant shot Turley first and Baldwin second. During an offer of proof, taken outside the presence of the jury, Marcia Woolley took the stand and stated that she would invoke her fifth amendment privilege against self-incrimination in response to all questions regarding the murders.

David Dailey testified for the defense that he had been married to Marcia Woolley for 10 years before they were divorced in 1990. Dailey stated that he and Marcia had gone hunting together and Marcia knew how to fire a gun. Dailey also related that Marcia had a very violent temper when consuming alcohol and that she would get very jealous of other women. According to Dailey, when jealous, Marcia would “do things physically.” On cross-examination, Dailey admitted that his divorce from Marcia was not amicable and that there had been a fight for custody of the children, which Marcia won.

Dawn Swearingen also testified for the defense. Swearingen stated that she was aware of animosity between Dee Turley and Marcia Woolley. Approximately two years' earlier, Marcia had told her that she suspected an affair between the defendant and Turley. Marcia stated that “someday she would get her revenge on Dee.” According to Swearingen, Marcia made similar comments on quite a few occasions. Swearingen, however, never saw Marcia actually carry out any of these threats.

Rita DeVinney also testified that she had heard Marcia Woolley, on many occasions, threaten to “get” Turley “when she least expected it.” DeVinney stated that Marcia asked her one Friday night to meet her at Phylly's to “back her up” so that she could “get” Turley. DeVinney did not know what Marcia meant by “get” Turley so she did not meet Marcia.

Gail Weir also testified that she had witnessed Marcia Woolley and Turley argue or fight. Weir stated that, approximately one year earlier, she heard Marcia accuse Turley of having an affair with the defendant and threaten her that she “would get what she had coming.” Marcia also told Weir that she had caught the defendant at Turley's house.

In rebuttal, the State called David Aldred. Aldred testified that he works at Blue Chip Industries and that he helped the defendant and Marcia obtain jobs there. The Woolleys worked at Blue Chip for a couple of months and then quit. The defendant told Aldred that he was having financial problems and that he owed a lot of money in taxes. The defendant also made a comment to Aldred, in early 1994, that it would be easy to commit a crime in Kewanee. On another occasion, while the defendant and Aldred were both drunk, defendant told Aldred that it would not bother him to “shoot up” an establishment or to kill someone.

Following closing arguments, the jury deliberated and returned a verdict finding the defendant guilty on all counts. The eligibility phase of the defendant's death sentencing hearing commenced immediately. No evidence was presented at the eligibility hearing, but arguments were presented by both sides. The jury found the defendant eligible for the death penalty based upon three statutory aggravating factors: (1) murder of two or more individuals (720 ILCS 5/9–1(b)(3) (West 1994)); (2) murder in the course of another felony (720 ILCS 5/9–1(b)(6) (West 1994)); and (3) murder committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life (720 ILCS 5/9–1(b)(11) (West 1994)).

The aggravation-mitigation phase of the death penalty hearing began one week later. The State first called Lieutenant Rod Huber of the Henry County sheriff's department. Lieutenant Huber testified that the defendant had been convicted in 1982 and 1984 of misdemeanor theft, in 1984 of criminal damage to property, a misdemeanor, and in 1984 of possession of cannabis, a misdemeanor.

The State again called Donald Tomsha. Tomsha testified that the defendant told him that he had done Baldwin “a favor” by shooting her the third time, since she would have been paralyzed had she lived. Tomsha testified that the defendant expressed no remorse for the murders, but rather, stated he would do it again. According to Tomsha, the defendant stated that he should have shot and killed Marcia and then shot himself to make it appear that Marcia shot everyone and then killed herself.

Tomsha also testified that defendant told him about other burglaries he had committed in the Kewanee area. According to Tomsha, the defendant admitted to burglarizing Blue Chip Industries, G&J Tavern, Phylly's, and Pines Trailer. Tomsha testified that the defendant wrote out a document relating his commission of several burglaries along with a map showing the location of the tools he had stolen from Blue Chip. Tomsha turned this document over to Lieutenant Huber.

Detective Cervantez testified for the State that the Kewanee police had been investigating a burglary at Phylly's, two burglaries at Pines Trailer, two burglaries at G&J Tavern, and a burglary at Blue Chip. The items stolen during the Blue Chip burglary included tools known as micrometers, other tools belonging to Dave Aldred, and a tool box belonging to Dave Greenhagen. The stolen micrometers were recovered from the location specified on the map contained in the document Tomsha attributed to the defendant. The tools and the tool box taken in that burglary were located in the possession of the defendant's step-father. On cross-examination, Detective Cervantez admitted that the police had located no evidence which linked these burglaries to any particular person. He also conceded that Tomsha could have committed these burglaries.

The State also presented evidence that the defendant was convicted of burglary in 1986 for breaking into a fertilizer factory. The defendant and another man were caught at the scene preparing to load equipment into their vehicle. The defendant was sentenced to 30 months' probation. In 1987, the defendant was caught by police attempting to use a crow bar to pry open the door of a liquor store. The defendant was arrested on charges of criminal damage to property, attempted burglary, and possession of burglary tools. These charges formed the basis of a petition to revoke the defendant's probation. The defendant's probation was revoked and he was sentenced to three years' imprisonment.

The State also presented evidence that, in 1987, the defendant was evaluated for the TASC (Treatment Alternatives for Special Clients) program, a statewide program for substance-abusing felony offenders. The defendant was deemed not acceptable for the program because he stated that he felt he could not deal with the structure of the program. According to the program coordinator, the defendant essentially told them that he did not want to participate in the program.

The State presented evidence that the defendant was convicted of felony theft in 1989. The defendant and another man had broken into the residence of the other man's friend and stolen a knife, some bottles of liquor, and a leather jacket. The State also presented evidence that the defendant was convicted in 1986 of misdemeanor theft for threatening another man and taking 24 cassette tapes from him.

Finally, the State called various family members of the victims, who described the impact on their lives resulting from the victims' deaths.

In mitigation, the defendant called several neighbors who testified that the defendant was a good neighbor who was helpful and caused no problems. They also testified that the defendant treated Marcia's children as if they were his own. The defendant's former boss at Pines Trailer stated that he was a good employee who got along well with his coworkers. A friend of the defendant testified that the defendant treated Marcia's children very well and had purchased bicycles for all of them. The defendant's sister testified that she and the defendant were separated at a young age when they were each adopted by different families. She stated that the defendant harbored a lot of anger about the adoption. The defendant's half-sister also testified that the defendant had some pent-up feelings about being adopted. She also relayed that the defendant was good with Marcia's children.

Psychiatrist Robert Chapman testified for the defense. Dr. Chapman caused a psychological test, the MMPI, to be administered to the defendant and examined the defendant personally. Dr. Chapman made three diagnoses of the defendant: (1) adult attention deficit disorder (ADD); (2) substance abuse disorder; and (3) antisocial personality disorder. Dr. Chapman described adult ADD as a pervasive difficulty in maintaining attention and concentration, causing abnormal impulsiveness. The adult ADD sufferer irritates others easily and, as a result, receives the message that he is not liked or that he is a bad person. According to Dr. Chapman, the second diagnosis, antisocial personality disorder, often accompanies adult ADD. Antisocial personality disorder manifests in behavior such as difficulties with authorities before the age of 15, school punishments, academic difficulties, and family conflicts, leading later to criminal behavior as an adult. With regard to the diagnosis of substance abuse disorder, Dr. Chapman relayed that the defendant had started using alcohol and marijuana as a teenager. The defendant told him that, at one point, he had a $250-per-day drug habit. The defendant also told him that he had used illegal drugs while in prison in 1988. Dr. Chapman testified that the defendant had suffered from these disorders for many years. The adult ADD and the substance abuse disorder could both be treated in prison. If the defendant were treated for these disorders, he could be a good prisoner.

On cross-examination, Dr. Chapman admitted that the second half of the defendant's MMPI was invalidated by the way in which the defendant filled it out. He conceded that it was possible that, on this half of the test, the defendant deliberately exaggerated his answers in an effort to appear more disturbed than he was. Dr. Chapman believed, however, that a more probable explanation was that, given his ADD, the defendant simply was not able to maintain his concentration for the second half of the test. Dr. Chapman also admitted that all of the information he used to evaluate the defendant came from the defendant himself and he did not verify any of this information using other sources. Dr. Chapman further admitted that more than half of the people in prison suffer from antisocial personality disorder. Dr. Chapman conceded that the defendant had graduated from high school.

Following closing arguments, the jury returned a verdict finding no mitigating factors sufficient to preclude a sentence of death. Accordingly, the trial court sentenced the defendant to death. The defendant's post-trial motion was subsequently denied. This direct appeal followed.

ANALYSIS

Trial Issues

Motion to Suppress Confession

The defendant first argues that the circuit court erred in denying his motion to suppress his confession on the ground that the police violated his right to counsel during custodial interrogation.

As noted, the defendant filed a motion to suppress his February 21, 1995, confession to police. The circuit court held a hearing on the motion. The State presented the testimony of the two police officers to whom the defendant had given the confession. Lieutenant Shannahan testified that he and Detective Cervantez began their interview of the defendant at approximately 7 p.m. on February 21, 1995. The defendant had previously been read his 
Miranda
 rights. At approximately 9:30 or 9:45 p.m., Lieutenant Shannahan learned that Marcia Woolley, who was being interviewed separately, had provided some information about the murders. He and Detective Cervantez left the room to speak with Detective Ince. Detective Ince informed them that Marcia had stated that the defendant shot Baldwin and Turley. Lieutenant Shannahan and Detective Cervantez then re-entered the room in which the defendant was waiting. Detective Cervantez told the defendant that Marcia had implicated him as the shooter. According to Lieutenant Shannahan's testimony, the following then occurred: “[The defendant] kind of sat up straight up into his chair and basically said that he wanted an attorney. He then said that I killed them. Yeah. I killed them.” When asked how long the interval of time was between the defendant's request for an attorney and his statement “I killed them,” Lieutenant Shannahan testified that it was “[j]ust a matter of seconds. It was almost conjunctive.”

Lieutenant Shannahan testified that Detective Cervantez then started to say something to the defendant, but Lieutenant Shannahan stopped him. Lieutenant Shannahan told the defendant that he had two statements he wanted to make to him. First, he told the defendant that “this is the only opportunity you will get to talk to us.” Second, he told the defendant that, in order for him to talk to them, he would have to “recant” his request for an attorney. The defendant then indicated that he wanted to talk to them without an attorney. The officers thereafter continued their interrogation of the defendant regarding the murders, during which the defendant implicated himself as the shooter. A formal tape-recorded statement was taken later. That statement was transcribed and the defendant signed each page. In that statement, the defendant stated that he had previously requested an attorney but had withdrawn that request.

Lieutenant Shannahan agreed that the defendant's request for an attorney was “unequivocal.” Lieutenant Shannahan was aware that, once a suspect requests an attorney, the interrogation must cease. He believed, however, that the defendant had re-initiated the interview by his statement “I killed them, yeah, I killed them.”

Detective Cervantez testified to the same events as Lieutenant Shannahan. In particular, Detective Cervantez stated that, after the defendant was told his wife had implicated him, the defendant “looked up and he stated he wanted an attorney and then as he put his head back down, he said, yeah, I killed them. Yeah, I killed them.” Detective Cervantez described the defendant's request for an attorney as “clear.” When asked about the time interval between the defendant's request for an attorney and his statement “I killed them,” Detective Cervantez responded that “[i]t wasn't really two, – it was like in the same breath.” Detective Cervantez testified that, based upon the defendant's statement “I killed them,” he believed that the defendant still wanted to discuss the murders.

The defendant testified on his own behalf. The defendant related that after he was told by the police that his wife had implicated him, he stated that he wanted an attorney, followed by “I didn't do it, I didn't do it.” The defendant denied that his request for an attorney was followed by his statement that he killed the victims. According to the defendant, Detective Cervantez then told him that “if he wanted to play hard ball, they could play hard ball,” and that it would be “easier” for the defendant if he would go ahead and talk to them. The officers then left the room for a short period of time. Upon returning, Lieutenant Shannahan told him that “this was the time” to talk to them and that it would be “easier” on him if he talked to them now.

On cross-examination, the defendant admitted that his second statement was unsolicited and voluntary. The defendant described this statement as more of an “out-loud thought” than it was an “actual statement.” The defendant testified that he eventually told the officers that he would talk to them without an attorney “[a]fter a period of time there when they keep [
sic
] telling me I should talk to them, yes.”

During arguments on the motion, defense counsel conceded that the defendant's comment immediately following his request for an attorney (either “I killed them” or “I didn't do it”) was unsolicited, and clarified that the defense was not seeking suppression of that statement. Rather, the defense was seeking suppression only of the defendant's subsequent confession, given in response to further police questioning. The trial court denied the defendant's motion to suppress.

The defendant makes two arguments with regard to the trial court's ruling on the motion to suppress. First, the defendant contends that the trial court erred because it failed to make the requisite determination that the defendant, rather than the police, initiated further conversation after the defendant's request for counsel. The defendant asserts that a new suppression hearing is therefore required. In the alternative, the defendant argues, even if we find that the trial court made the requisite finding that the defendant initiated further conversation, that finding was manifestly erroneous and should be reversed. Therefore, the defendant contends, his motion to suppress should have been granted and he is entitled to a new trial.

In 
Edwards v. Arizona
, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885 (1981), the Supreme Court held that when an accused invokes his right to have counsel present during custodial interrogation, he may not be subject to further interrogation without the presence of counsel unless “the accused himself initiates further communication, exchanges, or conversations with the police.” See also 
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); 
Minnick v. Mississippi
, 498 U.S. 146, 153, 112 L. Ed. 2d 489, 498, 111 S. Ct. 486, 491 (1990); 
People v. Brown
, 169 Ill. 2d 132, 149 (1996). If the police subsequently initiate a conversation with the accused in the absence of counsel, the accused's statements are presumed involuntary and are not admissible as substantive evidence at trial. 
People v. Winsett
, 153 Ill. 2d 335, 349 (1992). Any waiver of the right to counsel given in a discussion initiated by the police is presumed invalid. 
Winsett
, 153 Ill. 2d at 350. The 
Edwards
 rule is designed to “ `prevent police from badgering a defendant into waiving his previously asserted 
Miranda
 rights.' ” 
Minnick
, 498 U.S. at 150, 112 L. Ed. 2d at 496, 111 S. Ct. at 489; quoting 
Michigan v. Harvey
, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 302, 110 S. Ct. 1176, 1180 (1990).

Edwards
 and its progeny direct that a two-part inquiry be conducted to determine if an accused's statements made in response to police interrogation which followed the accused's request for an attorney are admissible as substantive evidence at trial. See 
Oregon v. Bradshaw
, 462 U.S. 1039, 1044-45, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2834 (1983); 
People v. Olivera
, 164 Ill. 2d 382, 389-90 (1995); 
People v. Hicks
, 132 Ill. 2d 488, 493 (1989). The preliminary inquiry is whether the accused, rather than the police, initiated further discussion after invoking the right to counsel. 
Bradshaw
, 462 U.S. at 1044-45, 77 L. Ed. 2d at 411-12, 103 S. Ct. at 2834; 
Olivera
, 164 Ill. 2d at 390. In order for the accused to “initiate” further conversation, for these purposes, the accused must make a statement that evinces a “willingness and a desire for a generalized discussion about the investigation.” 
Bradshaw
, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835; 
Olivera
, 164 Ill. 2d at 390-91. Inquiries or statements that relate to the routine incidents of the custodial relationship will not generally “initiate” a discussion for purposes of the 
Edwards
 rule. 
Bradshaw
, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

If the accused did not initiate a conversation with the police after a request for counsel, statements made in response to further interrogation are inadmissible under 
Edwards
. If, however, the accused did initiate a conversation, it must next be determined whether the accused's subsequent waiver of the right to counsel was knowing and intelligent. 
Bradshaw
, 462 U.S. at 1044, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834; 
Hicks
, 132 Ill. 2d at 493. The question at this juncture is whether the totality of the circumstances, including the fact that the accused reopened dialogue with the police, shows that the accused knowingly and intelligently waived his right to the presence of counsel during questioning. 
Olivera
, 164 Ill. 2d at 390; 
Hicks
, 132 Ill. 2d at 493.

There is no dispute in this case that the defendant invoked his right to counsel during custodial interrogation. There is also no dispute that the police subsequently interrogated the defendant and obtained his confession as a result. Accordingly, the first determination for the trial court to have made was whether the defendant, after invoking his right to counsel, initiated further conversation with the police in a manner evincing a willingness for a generalized discussion about the investigation. 
Olivera
, 164 Ill. 2d at 390. The defendant argues that the trial court failed to make this determination.

The record does not support the defendant's argument. The record reveals that the trial judge began his ruling by noting that one of the issues presented by the motion to suppress was “whether or not the defendant re-initiated conversation.” The trial court thereafter noted that there was no controversy over the fact that the defendant had requested an attorney. The court then emphasized that both sides admitted that, after the request for an attorney was made, the defendant made another statement which was unsolicited and voluntary.

The trial judge's comments show that he was aware that whether the defendant initiated further conversation was a necessary determination. The record also demonstrates that the trial court focused on the fact that the defendant, after requesting an attorney, 
made another statement
. The court's obvious reason for focusing on that circumstance was to determine whether this statement constituted “initiation” within the meaning of the 
Edwards
 rule. Both of the interrogating officers testified at the suppression hearing that they interpreted the defendant's second statement as his initiation of further conversation. We ordinarily presume that the trial judge knows and follows the law unless the record indicates otherwise. 
People v. Gaultney
, 174 Ill. 2d 410, 420 (1996). The record in this case does not indicate that the trial court failed to apply the proper standard in ruling on the motion to suppress.

We further determine, contrary to the defendant's assertion, that the evidence supports the finding that the defendant initiated further conversation with the police after invoking his right to counsel. Both Lieutenant Shannahan and Detective Cervantez testified that, although the defendant's request for counsel was clear, the defendant re-initiated the interview by making the subsequent statement. Both officers testified that the defendant's subsequent statement indicated to them that he wished to continue discussing the murder investigation. As noted, “initiation” by the accused, in this context, requires only that the accused make a statement that evinces a “willingness and a desire for a generalized discussion about the investigation.” 
Bradshaw
, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835; 
Olivera
, 164 Ill. 2d at 390-91. The suspect does not have to explicitly state that he wishes to resume interrogation. In 
Bradshaw
, a plurality of the Supreme Court held that a suspect's question to police–“Well, what is going to happen to me now?”–although ambiguous, constituted initiation within the 
Edwards
 rule because it evinced a willingness for a generalized discussion about the investigation. 
Bradshaw
, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835. Even a suspect's exculpatory statement following his request for counsel may constitute an initiation of further conversation about the investigation. In 
People v. Hicks
, 132 Ill. 2d 488, 493 (1989), this court held that a suspect initiated further conversation by “gratuitously offering exculpatory statements” to police.

The defendant's statement following his request for counsel in this case could clearly be considered his initiation of further conversation with the police. Whether the defendant said “I killed them” or “I didn't do it,” the defendant's statement could be found to evince a willingness to continue a generalized discussion about the investigation. Consequently, we are not persuaded that the trial court's finding that the defendant initiated further conversation was manifestly erroneous.

The defendant correctly points out that the trial court declined to decide the factual question of whether his second statement was “I killed them” or “I didn't do it.” The defendant submits that the trial court was required to make this factual determination in order to decide if the comment constituted initiation of further dialogue. We agree with the State that it was appropriate for the trial court to refrain from making this factual determination. As discussed above, either comment, “I killed them” or “I didn't do it,” could be found to evince a willingness for a generalized discussion of the investigation. Although the substance of an accused's statement is, of course, crucial to a determination of whether the accused initiated further conversation, here the trial court could refrain from deciding between the two conflicting accounts of the statement because either choice would lead to the same result. The trial court properly ruled that the jury should decide whose version of this statement to believe.

The defendant also argues that the timing of the second statement precludes a finding that it constituted initiation of further conversation. As the defendant points out, both of the interrogating officers testified that the second statement was made by the defendant immediately following his request for an attorney. This testimony, the defendant contends, demonstrates that the second statement was simply a part of the request itself and was not an initiation of further conversation. We disagree. The two interrogating officers did not interpret the defendant's second statement to be a part of the request itself. Rather, each officer believed that, by this statement, the defendant was demonstrating his willingness to continue the discussion of the investigation. Moreover, the defendant himself testified at the suppression hearing and, although he disputed the substance of the second statement, he did not claim that it was a part of his request for an attorney. Nothing in 
Edwards
 or its progeny suggests that a suspect's initiation of further conversation cannot immediately follow his request for counsel. Whether the defendant's second statement constituted initiation of further conversation or was simply a part of the request for counsel was a question of fact for the trial court to decide. We find no reason to reverse the trial court's ruling on this issue.

The trial court was therefore required to determine whether the defendant's subsequent waiver of his right to counsel was knowing and intelligent. 
Olivera
, 164 Ill. 2d at 390. The trial court found that the waiver was knowing and intelligent and the defendant has not challenged that finding on appeal. We therefore affirm the trial court's ruling denying the defendant's motion to suppress his confession.

Ineffective Assistance of Counsel

The defendant next challenges his convictions on the ground that his trial counsel rendered ineffective assistance. The defendant argues that defense counsel was ineffective in failing to challenge inaccurate testimony of Lieutenant Shannahan regarding the availability of tests to determine if an individual has recently fired a gun. During defense counsel's cross-examination of Lieutenant Shannahan, the following colloquy took place:

“Q. Now did you perform any tests on the defendant's hands to determine if, whether or not he had fired any gun?

A. No. That test is antiquated. Nobody has used it in years.

Q. You don't use it anymore?

A. No. It is unreliable.”

The defendant contends that defense counsel was ineffective for failing to challenge this testimony through further cross-examination and by failing to call an expert witness to dispute the assertion regarding the unreliability of gunshot residue tests. According to the defendant, while the gunshot residue tests known as “paraffin” tests are no longer generally accepted in the scientific community, two other gunshot residue tests, “atomic absorption analysis” and “neutron activation analysis,” have both been proven reliable and have been held admissible in criminal prosecutions. Given that the decisive issue at trial was whether the defendant or his wife shot and killed the victims, the defendant argues that counsel's failure to challenge Lieutenant Shannahan's inaccurate testimony was highly prejudicial to his defense.

We agree with the State that this issue is raised prematurely. The defendant points to several cases that refer to the tests he now asserts should have been performed. See 
People v. Ward
, 154 Ill. 2d 272, 315-16 (1992);
 People v. Johnson
, 114 Ill. 2d 170, 194-98 (1986). The record, however, does not contain any evidence to substantiate the defendant's contention that reliable, accepted gunshot residue tests existed which could have been performed or any evidence as to what such tests could have shown. As a result, we are unable to evaluate the defendant's claim that evidence existed which could have been introduced to contradict Lieutenant Shannahan's testimony. Because this argument relies on matters outside the record, we cannot address it in this appeal.

Armed Violence and Armed Robbery Convictions

The defendant next contends that he was improperly convicted of both armed robbery and armed violence based on the predicate felony of robbery. The defendant was charged with one count of armed robbery in that he “while armed with a dangerous weapon, a gun, took property, being United States Currency, from the presence of Rane Baldwin, by the use of force, in violation of 720 ILCS 5/18–2(a).” The defendant was also charged with one count of armed violence in that he “while armed with a dangerous weapon, a handgun, performed acts prohibited by Illinois Compiled Statutes, Chapter 720, Act 5, Section 18–1, in that he intentionally and without legal justification took property, being United States Currency, from the presence of Rane Baldwin, by the use of force, in violation of 720 ILCS 5/33A–2.” The defendant was convicted of both offenses and sentenced to concurrent terms of 30 years' imprisonment on the armed robbery conviction and 30 years' imprisonment on the armed violence conviction.

Relying on this court's recent decision in 
People v. Lewis
, 175 Ill. 2d 412 (1996), the defendant contends that his conviction and sentence for armed violence must be vacated. The defendant argues that, because his armed robbery and armed violence convictions were both premised on his commission of robbery while armed with a handgun,
 
he was convicted of two substantively identical offenses which carry sentences that are unconstitutionally disproportionate. In 
Lewis
, we held that the penalties for armed robbery and armed violence predicated on robbery committed with a category I weapon, such as a handgun, are unconstitutionally disproportionate. In reaching this holding, we first determined that the two offenses were substantively identical. Armed robbery, however, carried a minimum prison sentence of 6 years (730 ILCS 5/5–8–1(a)(3) (West 1994)), while armed violence carried a mandatory minimum term of 15 years' imprisonment (720 ILCS 5/33A–3(a) (West 1994)). Accordingly, we held that the penalty for armed violence predicated on robbery committed with a category I weapon violates the proportionate penalties clause of the Illinois constitution. On that basis, we upheld the circuit court's dismissal of the armed violence charge. 
Lewis
, 175 Ill. 2d at 418-19.

The State essentially concedes that 
Lewis 
governs our decision in this case, and urges that we reconsider 
Lewis
. We decline to do so. The State also argues that we should find that the defendant waived this error by failing to raise it in the trial court. The 
Lewis
 decision was premised on 
People v. 
Christy
, 139 Ill. 2d 172 (1990). In 
Christy
, the defendant had failed to raise the disproportionate penalties argument in the trial court. Nevertheless, this court held that the defendant did not waive the issue because “ `a constitutional challenge to a statute can be raised at any time.' ” 
Christy
, 139 Ill. 2d at 176, quoting 
People v. Bryant
, 128 Ill. 2d 448, 454 (1989). Waiver is therefore not appropriate here. Accordingly, under the authority of 
Lewis
 and 
Christy
, the defendant's conviction and sentence for armed violence must be vacated.

The defendant contends that he is therefore entitled to be resentenced on his remaining noncapital convictions. Because the defendant was sentenced to identical concurrent terms for armed violence and armed robbery, we agree with the State that resentencing is not required as a result of the vacatur of the armed violence conviction and sentence. See 
People v. Donaldson
, 91 Ill. 2d 164, 170-71 (1982).

Given our holding, we need not consider the defendant's alternative argument that his armed robbery conviction must be vacated under the “one act, one crime” doctrine because that conviction and his conviction for armed violence were based upon the same conduct.

In summary, we reject the defendant's contentions that he is entitled to a new trial. The defendant's convictions for murder, armed robbery, and unlawful possession of a weapon by a felon are affirmed. The defendant's conviction and sentence for armed violence, however, are vacated.

Sentencing Issues

Characterization of Misdemeanor Convictions as Felonies

The defendant charges that he is entitled to a new sentencing hearing because the prosecutor improperly told the jury that it should consider the defendant's prior misdemeanor convictions as felonies.

During the aggravation-mitigation phase, the State called Lieutenant Rod Huber to testify about some of the defendant's prior convictions. In particular, Lieutenant Huber testified that the defendant had been convicted of three misdemeanors. In 1982, at the age of 17, the defendant was convicted of misdemeanor theft after he admitted to breaking into an automobile and stealing stereo equipment and $19 in cash. In 1984, the defendant was convicted of misdemeanor theft after he made an unauthorized entry into a residence and stole some cash. Also in 1984, the defendant was convicted of misdemeanor criminal damage to property after he and another man kicked in the sides of an automobile. During his direct examination, Lieutenant Huber agreed with the prosecutor that each of these offenses “could have been” charged as felonies, but were charged as misdemeanors. During closing arguments, the prosecutor continued with this theme, arguing to the jury as follows:

“At age seventeen in Henry County he committed his first criminal violation that we are aware of and it was a charge that had the elements of a burglary and a felony theft, but it was charged as misdemeanor theft.

When he was nineteen, again he committed an offense that had all the elements of burglary and a felony theft. In fact, today it would be a residential burglary. He pled to a misdemeanor theft.

He had a criminal damage to property charge in Henry County when he was nineteen years of age, could have been a felony. He was allowed to plead on a misdemeanor.

* * *

All you heard Officer Benson, I believe, testify to a criminal charge in Knox County, that the defendant eventually pled to misdemeanor theft, had all the elements of a robbery.

* * *

This defendant has committed numerous felony type offenses. He has been convicted of numerous felonies, and almost all of his conduct that he has ever been convicted of, the misdemeanors had all the elements of felonies.”

The prosecutor touched on this theme again in rebuttal closing argument, stating that the Henry County cases had “all the elements of felonies.”

The defendant contends that the prosecutor committed error in eliciting testimony from Lieutenant Huber that his misdemeanor convictions “could have been” felonies and in urging the jury to consider his prior misdemeanor convictions as felonies.

This issue is governed by our decision in 
People v. Williams
, 161 Ill. 2d 1 (1994). In 
Williams
, evidence was presented during the defendant's death sentencing hearing regarding the defendant's prior conviction for voluntary manslaughter. That evidence included the defendant's confession in the prior case in which he related that he held the victim, James Fortner, down while an accomplice beat and choked Fortner. During closing arguments at the death sentencing hearing, the prosecutor repeatedly characterized the defendant's acts with regard to Fortner's death in the prior case as “cold blooded murder” and “conspiracy to commit murder.” On appeal, the defendant contended that he was denied a fair sentencing hearing because the prosecutor improperly characterized his voluntary manslaughter conviction as murder. The defendant argued that the prosecutor's remarks were factually and legally incorrect and highly prejudicial. This court agreed that the defendant was denied a fair sentencing hearing by the prosecutor's remarks. We reasoned that:

“It is a fundamental principle of criminal jurisprudence that a conviction of a lesser offense operates as an acquittal of a greater offense. [Citation.] Whatever the prosecutor's personal opinion on the nature of defendant's participation in the Fortner killing, the fact remains that defendant was not convicted of murder or conspiracy to commit murder. The prosecutor's statement that defendant participated in a conspiracy to commit murder and that his conduct amounted to cold blooded murder were misrepresentations of the evidence and the law.” 
Williams
, 161 Ill. 2d at 78.

We held in 
Williams
 that the defendant was denied a fair sentencing hearing based on these comments and other misconduct by the prosecution. We concluded that the prosecutors' conduct “appears to have been a calculated course of action to play upon and incite the emotions and prejudices of the jury.” 
Williams
, 161 Ill. 2d at 81. A new sentencing hearing was therefore ordered. We recently reaffirmed this holding in 
People v. Hooper
, 172 Ill. 2d 64, 81-83 (1996), where we held that a prosecutor committed error in arguing to the jury that the defendant's prior conviction for voluntary manslaughter should be considered murder.

The same type of improper argument that we condemned in 
Williams
 was repeated by the prosecutor in this case. As we noted in 
Williams
, “[i]t is of vital importance to society and to the defendant that any decision to impose the death penalty is, and appears to be, based upon reason rather than emotion.” 
Williams
, 161 Ill. 2d at 77, citing 
People v. Holman
, 103 Ill. 2d 133, 163 (1984). The death penalty determination must therefore focus on the particular character and record of the defendant. 
Holman
, 103 Ill. 2d at 163. Moreover, because of the qualitative difference between death and other forms of punishment, a high standard of procedural accuracy is required when determining whether the death penalty will be imposed. 
Hooper
, 172 Ill. 2d at 76; 
Williams
, 161 Ill. 2d at 77. It is also well settled that parties in closing arguments may not go beyond the evidence presented and inferences therefrom, misstate the law, or express personal opinions on the evidence. 
Williams
, 161 Ill. 2d at 78. In particular, prosecutorial arguments that are calculated to divert the jurors' attentions from the evidence and play upon their emotions are manifestly improper at a capital sentencing hearing.

The prosecution may properly present evidence at the aggravation-mitigation phase concerning the details of crimes for which the defendant has previously been convicted. 
People v. Owens
, 102 Ill. 2d 88, 112 (1984). The prosecution may not, however, characterize the defendant's prior offenses as more serious than actually adjudicated. Here, as in 
Williams
, the prosecutor clearly sought to mischaracterize the defendant's criminal history. Regardless of the prosecutor's personal opinions on the seriousness of the defendant's prior offenses, the defendant was convicted only of misdemeanors and it was improper for the prosecutor to characterize those misdemeanors as felonies and to urge the jury to consider them as such. A defendant may not be sentenced on the basis of “ `assumptions concerning his criminal record which [are] materially untrue.' ” 
Lewis v. Lane
, 832 F.2d 1446, 1457 (7th Cir. 1987), quoting 
Townsend v. Burke
, 334 U.S. 736, 741, 92 L. Ed. 1690, 1693, 68 S. Ct. 1252, 1255 (1948).

The State attempts to distinguish 
Williams
 by asserting that here, unlike in 
Williams
, there was evidence, in the form of Lieutenant Huber's testimony, to “support” the characterization of these offenses as felonies. This attempt to distinguish 
Williams
 is unavailing. In 
Williams
, the State asserted on appeal that there was no dispute as to the defendant's participation in the Fortner killing, only as to the “label to attach to it.” This court rejected the State's argument, noting:

“The State's assertion on appeal that the only dispute regarding defendant's participation in the Fortner homicide was merely `the label to attach to it' ignores the clear legal differentiation between adjudications of guilt of voluntary manslaughter and murder. It also demonstrates the same disregard shown by the prosecutor of the mandate that there be a high degree of accuracy in a proceeding to determine whether a defendant should be put to death. The `label' attached to defendant's criminal conduct in the final adjudication of the Fortner case was `voluntary manslaughter,' not murder.” 
Williams
, 161 Ill. 2d at 79.

Moreover, in 
Williams
, substantial evidence, including the defendant's own confession, was introduced at the death penalty hearing regarding the defendant's role in the killing of Fortner. Thus, it was not a lack of evidence to support the characterization of “murder” that prompted this court's holding in 
Williams
. The legal principle violated in this case is indistinguishable from that violated in 
Williams
.

The State contends that any error resulting from the prosecutor's comments was harmless. We disagree. Given the facts of this case, we find that the prosecutor's improper comments deprived the defendant of a fair and reliable sentencing hearing. The evidence presented by the State in aggravation was not overwhelming. That evidence consisted primarily of the defendant's prior criminal history. While the defendant did have prior criminal convictions, all of those convictions were for nonviolent, property crimes and none involved any injury to a person. The record reveals that the defendant was convicted of two felonies, a 1986 burglary of a fertilizer plant and a 1989 felony theft wherein the defendant and another man stole a knife, some liquor, and a jacket from the house of the other man's friend. The remainder of the defendant's prior convictions were for misdemeanor offenses. The prosecutor's comments, however, attempted to improperly enhance the defendant's prior criminal history. The comments were a calculated attempt by the prosecutor to encourage the jury to base its sentencing decision on something other than an accurate account of the defendant's criminal record.

 Moreover, the prosecutor's comments to this effect were not isolated references. A major theme of both the prosecutor's opening and closing arguments at the aggravation-mitigation phase was the defendant's “extensive” history of criminal convictions which, according to the prosecutor's comments, should all be considered to have been felonies. In 
Williams
, we found it significant that the prosecutor's improper comments were not simply “isolated comments made in the course of a lengthy and otherwise proper argument.” 
Williams
, 161 Ill. 2d at 78; 
cf. 
Hooper
, 172 Ill. 2d at 83 (prosecutor's comment, though highly improper, did not constitute reversible error because it was an isolated remark). In addition, the defendant here presented a number of witnesses in mitigation, including friends, relatives and coworkers, and a psychiatrist who related that the defendant suffered from several disorders, including drug and alcohol abuse. On this record, we cannot conclude, beyond a reasonable doubt, that the prosecutor's deliberate and repeated mischaracterization of the defendant's criminal record did not contribute to the jury's decision to sentence the defendant to death. 
People v. Jimerson
, 166 Ill. 2d 211, 228 (1995); see also 
Lewis v. Lane
, 832 F.2d 1446, 1457 (7th Cir. 1987) (“The difference between two prior felony convictions and four prior felony convictions in determining whether to impose the death penalty is without a doubt significant”). We hold that the defendant is therefore entitled to a new sentencing hearing.

The State also contends that the defendant waived consideration of this issue because defense counsel failed to object to the improper comments. The defendant urges that we consider this error to be plain error or, in the alternative, find that his counsel rendered ineffective assistance in failing to object. A defendant's waiver of a capital sentencing issue will be excused under the plain error rule where the evidence is closely balanced or where the error is of such magnitude that the defendant was denied a fair sentencing hearing. 
People v. Rissley
, 165 Ill. 2d 364, 394 (1995); 
People v. Szabo
, 94 Ill. 2d 327, 355 (1983). We have already found that the prosecutor's comments deprived the defendant of a fair and reliable death sentencing hearing and that the evidence in aggravation was not overwhelming. The defendant's waiver is therefore excused under the plain error rule. See 
People v. Johnson
, 146 Ill. 2d 109, 146-47 (1991) (waiver excused because issue of prosecutorial misstatements concerned fairness of death sentencing hearing); 
Holman
, 103 Ill. 2d at 176-77; 
Szabo
, 94 Ill. 2d at 355.

Accordingly, we vacate the defendant's death sentence and remand for a new capital sentencing hearing. We address the remaining sentencing issues because they are likely to recur on remand.

Unconstitutionally Vague Aggravating Factor

The defendant argues that the jury was allowed to consider an unconstitutionally vague statutory aggravating factor at the aggravation-mitigation phase of the hearing. As noted, one of the three statutory aggravating factors found to exist by the jury at the eligibility phase was that the defendant committed murder in a “cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means.” 720 ILCS 5/9–1(b)(11) (West 1995). At the close of the aggravation-mitigation phase, both the prosecutor and the trial court told the jurors they should consider this aggravating factor in their deliberations. The defendant claims that section 9–1(b)(11) of the Criminal Code of 1961 is unconstitutionally vague and was therefore improperly considered by the jury at his death sentencing hearing.

As the defendant acknowledges, this court in 
People v. Johnson
, 154 Ill. 2d 356, 372-73 (1993), rejected the argument that the aggravating factor contained in section 9–1(b)(11) is unconstitutionally vague. The defendant asks us to reconsider our holding in 
Johnson
 in light of the Florida Supreme Court's more recent decision in 
Jackson v. State
, 648 So. 2d 85 (Fla. 1994). Subsequent to the Florida Supreme Court's decision in 
Jackson
, however, this court has reaffirmed the 
Johnson
 holding that section 9–1(b)(11) is not unconstitutionally vague. 
People v. Mulero
, 176 Ill. 2d 444 (1997); 
People v. Williams
, 173 Ill. 2d 48, 89-90 (1996). We therefore decline the defendant's invitation to reconsider our holding on this issue.

Prosecution's Rebuttal Closing

The defendant also argues that the trial court improperly allowed the prosecution to present both an initial and a rebuttal closing argument at the aggravation-mitigation phase. This was improper, the defendant contends, because the State bears no burden of proof at this stage of a death sentencing hearing. This court has repeatedly rejected the argument that it is improper for the prosecution to present rebuttal argument at the aggravation-mitigation phase of a death sentencing hearing. 
People v. Williams
, 161 Ill. 2d 1, 56 (1994); 
People v. Kitchen
, 159 Ill. 2d 1, 47 (1994); 
People v. Fair
, 159 Ill. 2d 51, 94 (1994). The defendant presents no persuasive basis for reconsideration of those decisions.

Constitutionality of the Death Penalty Statute

Finally, the defendant makes several constitutional challenges to the Illinois death penalty statute, each of which has been previously rejected by this court. We decline to reconsider our previous decisions rejecting the argument that the death penalty statute is unconstitutional because it places a burden on the defendant which precludes meaningful consideration of mitigating evidence. See 
People v. Johnson
, 154 Ill. 2d 356, 373 (1993); 
People v. Bean
, 137 Ill. 2d 65, 138 (1990). We also decline to reconsider our previous decisions rejecting the argument that the death penalty statute is unconstitutional because it allows the sentencer to weigh the “vague” aggravating factor of “any other reason” why a defendant should be sentenced to death. See 
People v. Young
, 128 Ill. 2d 1, 59 (1989); 
People v. Orange
, 121 Ill. 2d 364, 390-91 (1988). Finally, we decline to reconsider our previous holdings rejecting the argument that various features of our death penalty statute, considered jointly, render the statute unconstitutional. See 
People v. Edgeston
, 157 Ill. 2d 201, 247 (1993).

CONCLUSION

For the foregoing reasons, the defendant's convictions for murder, armed robbery and unlawful possession of a weapon by a felon are affirmed. The defendant's conviction and sentence for armed violence are vacated. The defendant's death sentence is also vacated and this cause is remanded to the circuit court for a new capital sentencing hearing.

Judgment affirmed in part

and reversed in part;

death sentence vacated;

cause remanded.