THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. BRANDON D. MILLER, Defendant-Appellee.

Second District   No. 2—07—0391

Opinion filed August 20, 2009.

HUTCHINSON, J., dissenting.

John A. Barsanti, State's Attorney, of St. Charles (Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

William P. Gibbs, of Law Office of William P. Gibbs, of Geneva, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Brandon D. Miller, was charged by indictment in the circuit court of Kane County with two counts of hate crime (720 ILCS 5/12—7.1(a) (West 2006)) and a single count each of criminal damage to property (720 ILCS 5/21—1(1)(a) (West 2006)) and criminal defacement of property (720 ILCS 5/21—1.3(a) (West 2006)). The charges were based on allegations that defendant spray-painted anti-Semitic and antihomosexual messages on a house in South Elgin. Defendant moved to suppress statements he made to police following his arrest. He maintained that the statements were made in response to police questioning that violated his fifth amendment right to have counsel present during custodial interrogation. The trial court granted the motion and the State, following the denial of its motion for reconsideration, filed a timely notice of appeal. We reverse and remand.

The State presented evidence first at the hearing on the motion to suppress. Andrew Nelson, the South Elgin police officer who arrested defendant, testified that the arrest took place at defendant's home.

Nelson advised defendant of his *Miranda* rights, and defendant invoked his right to have an attorney present at any questioning. After defendant was placed under arrest, Nelson called for a tow truck to tow defendant's vehicle to the police station. When the tow truck arrived, Nelson drove defendant to the police station. They did not speak during the trip, and when they arrived Nelson asked defendant some questions for booking purposes and then placed him in a cell. Defendant later asked to make a telephone call, and Nelson permitted him to do so. It was Nelson's belief that defendant had called his father. On direct examination, Nelson testified that, while on the telephone, defendant asked Nelson why his car had been towed; on cross-examination, Nelson agreed that defendant's question was "something like" one defense counsel suggested: "What's going to happen to my car?" In response to defendant's question, Nelson replied that, if defendant was going to ask questions, Nelson would have to read defendant's *Miranda* rights to him. Defendant asked, "[D]o I have to answer everything?" Nelson responded that he did not. Nelson then read *Miranda* warnings aloud from a printed form. Asked what happened next, Nelson stated that defendant agreed to questioning. Nelson had defendant sign a waiver at the bottom of the form, stating that he understood what his rights were and was willing to answer questions.

Nelson testified on cross-examination that he probably told defendant he would answer defendant's questions after defendant signed the form. During redirect examination, the following exchange occurred:

"Q. When [defendant] asked you about the car, you said that you raised the issue—or, you said that you couldn't talk to him because of *Miranda*?

A. Correct.

Q. And then the next statement he made, what was that?

A. The next statement he made? I advised him, and what he—he initially blurted out it wasn't a hate crime, as far as the—I believe he initially said it wasn't a hate crime.

Q. When did he say that?

A. Um, again, I am not sure exactly. Right after we—right after I told him I had to read him his rights, or right after I read him his rights. I'm not sure exactly what time he said that."

After defendant signed the waiver, Nelson advised Sergeant Michael Doty that defendant had initiated contact with Nelson and was "going to answer some questions." Doty reread the form to defendant. Defendant placed his initials on the form by the statement of each particular right. Nelson then interviewed defendant and

defendant signed a written statement indicating, *inter alia*, that he had spray-painted the house in South Elgin. Doty similarly testified that he "went over" defendant's rights and had defendant initial the form. Nelson then started questioning defendant. Doty was present when defendant signed the written statement.

After the State rested, the trial court ruled that the State failed to meet its burden of showing that, after invoking his right to counsel, defendant initiated contact with the police in a manner evincing a willingness to discuss the alleged offense. According to the trial court, "defendant's question, why did you tow the car, \*\*\* did not indicate a willingness on his part to discuss the alleged offense." Concluding that the police were therefore barred from interrogating defendant without counsel present, the trial court granted the motion to suppress. The State now appeals that ruling.[1]

Although a defendant bears the burden of proof on a motion to suppress evidence illegally seized (725 ILCS 5/114—12(b) (West 2006)), the State bears the burden of proof to establish the admissibility of a confession if a defendant moves to suppress it as involuntary (725 ILCS 5/114—11(d) (West 2006); *People v. Slater*, 228 Ill. 2d 137, 149 (2008)). Since defendant here argued that his statement to police should have been suppressed as involuntary, the State bore the burden of proof on defendant's motion to suppress.

Normally, when reviewing a trial court's ruling on a motion to suppress evidence allegedly obtained in violation of *Miranda*, we "accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence." *People v. Jeffers*, 365 Ill. App. 3d 422, 427 (2006). However, here, the trial court entered a directed finding at the close of the State's presentation of evidence. The standard for a directed finding requires the court to take the evidence in the light most favorable to the nonmoving party and to determine if that party could be deemed to have met its burden of proof. See *People v. Connolly*, 322 Ill. App. 3d 905, 916 (2001) (explaining standard for directed finding at the close of the State's case at trial). Although there are some factual discrepancies in the record (primarily, at what point defendant made the unsolicited statement that he did not commit a hate crime and whether defendant asked why his car had been towed, what happened

---

[1]After the trial court's ruling, the State presented along with its motion to reconsider an offer of proof that at least partially would have explained their purpose for towing defendant's car, but, in declining to revisit its ruling on the motion to suppress, the trial court also declined to admit the evidence. The State does not contest that decision on appeal.

to his car, or both), the parties do not ask that we resolve those discrepancies in deciding this appeal.[2] Instead, they direct their arguments to the legal significance of defendant's interactions with police notwithstanding any confusion about the facts. We therefore confine our analysis to that issue. "[T]he ultimate question posed by the legal challenge to the trial court's ruling" is reviewed *de novo. Jeffers*, 365 Ill. App. 3d at 427. Here, the ultimate question we face is whether the State met its burden of showing that defendant, having invoked his right to an attorney, thereafter initiated communications with police.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held that, as a safeguard for the fifth amendment privilege against self-incrimination, an individual subjected to custodial interrogation is entitled to have counsel present during the questioning. In *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), the Court clarified that, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85. Moreover, "an accused, *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885. Law enforcement authorities violate this rule if they approach the accused for further interrogation without making counsel available. *People v. Winsett*, 153 Ill. 2d 335, 349 (1992). Thus, "[a]ny waiver of the right to counsel given in a discussion initiated by the police is presumed invalid, and statements obtained pursuant to such a waiver are inadmissible in the prosecution's case in chief." *Winsett*, 153 Ill. 2d at 350.

■ When a defendant has invoked the right to counsel and is later interrogated without counsel present, determining the admissibility of any statements obtained entails a two-part inquiry. "The preliminary

---

[2]The dissent bases its position on the idea that defendant asked what happened to his car, not why his car had been towed. However, the above standard dictates that we take the facts in the light most favorable to the State, and the facts in that light indicate that defendant asked why his car had been towed, not what would happen to it. (The trial court also assumed that defendant asked why his car had been towed, so deference to its findings, to the extent such deference is due, also compels us to assume that defendant asked why his car had been towed.)

inquiry is whether the accused, rather than the police, initiated further discussion" after the accused invoked the right to counsel. *People v. Woolley*, 178 Ill. 2d 175, 198 (1997). If statements made during a conversation following a suspect's invocation of the right to counsel are to be admissible, " 'the impetus' " for the conversation " 'must come from the accused, not from the officers.' " W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.9(f), at 844 (3d ed. 2007), quoting *Metcalf v. State*, 284 Ark. 223, 225, 681 S.W.2d 344, 345 (1984). If a defendant who has invoked the right to counsel does not initiate a conversation with law enforcement officials, *Edwards* bars the admission of statements made in response to further interrogation *Woolley*, 178 Ill. 2d at 199. If the defendant did initiate a discussion with police, the court must move on to the second part of the inquiry and determine whether "the totality of the circumstances, including the fact that the accused reopened dialogue with the police, shows that the accused knowingly and intelligently waived his right to the presence of counsel during questioning." *Woolley*, 178 Ill. 2d at 199.

Here, we are concerned with the first inquiry—whether defendant, rather than police, initiated the discussion about defendant's case. A discussion will be deemed initiated by a defendant, and therefore admissible under *Edwards*, when it follows from the defendant "mak[ing] a statement that evinces a 'willingness and a desire for a generalized discussion about the investigation.' " *Woolley*, 178 Ill. 2d at 198, quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2835 (1983) (plurality op.). A discussion will be deemed initiated by police, and therefore inadmissible under *Edwards*, where the statement follows police "implicitly introduc[ing] the subject of further questioning by initiating a discussion concerning the matter of representation." *People v. Trotter*, 254 Ill. App. 3d 514, 524 (1993). "[I]f there has been some kind of police conduct preceding and allegedly contributing to the defendant's supposed 'initiation,' the question becomes how that conduct is to be judged in determining where the 'impetus' lies." W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.9(f), at 844-45 (3d ed. 2007).

The relevant interaction between defendant and police began with defendant's asking Nelson why defendant's car had been towed. The testimony indicated that Nelson responded by telling defendant that Nelson would have to reread defendant his *Miranda* rights if defendant was going to ask questions. After that exchange, defendant either immediately made an inculpatory statement ("It wasn't a hate crime") or asked if he could choose which questions to answer. Either response must be understood to contemplate discussion about defendant's case. Thus, the question becomes whether, up to and

including that point, the "impetus" for defendant's speaking about the case originated with him or with Nelson.[3]

The parties rely on two cases for their competing answers to this question. The State relies primarily on the United States Supreme Court's decision in *Bradshaw*, while defendant relies strongly on our supreme court's later decision in *People v. Olivera*, 164 Ill. 2d 382 (1995).

In *Bradshaw*, the accused, after invoking his right to an attorney, asked a police officer, " 'Well, what is going to happen to me now?' " *Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833. The officer's response was of somewhat the same flavor as Nelson's response in this case; the officer stated, " 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will.' " *Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833. A plurality of the Supreme Court observed:

> "[T]here are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

The *Bradshaw* plurality concluded that the defendant's question was not one of the above-described "routine" inquiries:

> "Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a

---

[3]The dissent argues that the impetus for defendant's question came from his father, with whom he was speaking on the telephone when he asked Nelson about his car, and it says it knows of no law that allows police questioning after an invocation of the right to counsel when a conversation between police and the defendant is "instigated by a third party." 393 Ill. App. 3d at 1073. However, defendant asked the question of his own volition. We see no legal significance in the possibility that his father motivated him to ask the question, and we disagree with the dissent that the question "appears to be a question posed by defendant's father rather than defendant himself." 393 Ill. App. 3d at 1073.

desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that '[y]ou do not have to talk to me,' and only after the accused told him that he 'understood' did they have a generalized conversation." *Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412-13, 103 S. Ct. at 2835.

Although the Supreme Court in *Bradshaw* at least nominally distinguished between inquiries about the "routine incidents of the custodial relationship" and inquiries that evince the suspect's desire for "a more generalized discussion," the essence of the distinction drawn in *Bradshaw* is not whether the accused's statement to police is "general" or specific. The critical distinction in *Bradshaw* separates inquiries that do not pertain to the investigation (such as those inquiries that are limited to the "routine incidents of the custodial relationship," *e.g.*, a request for a drink of water) from inquiries that "relat[e] directly or indirectly to the investigation." An invitation to have a general discussion about an investigation will, of course, meet the *Bradshaw* test, but so too would an invitation to discuss a very specific matter relating to the investigation. For example, under *Bradshaw*, a suspect opens the door to police questioning about at least some aspect of the investigation if he tells police that he is willing to discuss the specific matter of his car's involvement in an alleged crime even if he does not invite a general discussion about the case. We therefore understand the Supreme Court's use of the word "general" in this context to mark a distinction between questions not pertaining to the investigation (such as questions limited to the incidents of the custodial relationship) and those pertaining to the investigation, specific or not.

In *Olivera*, the other major case upon which the parties rely, the defendant, who had just participated in a lineup, asked a police officer "What happened?" and the officer told the defendant that he had been positively identified. The Illinois Supreme Court rejected the State's argument that the defendant's question initiated a discussion with police. The *Olivera* court stated that "[t]o ascribe such significance to this limited question would render virtually any remark by a defendant, no matter how offhand or superficial, susceptible of interpretation as an invitation to discuss his case in depth" and would "amount to a perversion of the rule fashioned in *Edwards* and articulated more fully in *Bradshaw*." *Olivera*, 164 Ill. 2d at 391. Although the defendants' questions in *Olivera* and *Bradshaw* were

similar, the supreme court distinguished the cases based on the police response to each defendant's question. *Olivera*, 164 Ill. 2d at 391. Our supreme court noted that, in *Bradshaw*, the officer responded to the defendant's question by reminding him that he did not have to speak and could wait for his attorney, while, in *Olivera*, police "did not respond with any such warnings but, instead, answered the defendant's question." *Olivera*, 164 Ill. 2d at 391. Our supreme court then concluded that the police action in *Olivera* amounted to the functional equivalent of interrogation, because police should have known that providing the defendant an answer to his question was "reasonably likely to elicit an incriminating response." *Olivera*, 164 Ill. 2d at 391-92, citing *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980) (articulating the definition of "interrogation" as that term is used in *Miranda* cases). After deeming the police response the equivalent of an interrogation, our supreme court stated that, "If a question by an accused who has invoked his right to the presence of counsel during custodial investigation is to be deemed an initiation of a conversation in a manner evincing a willingness and a desire for a generalized discussion concerning the investigation, the proper response of the police to such a question must be to advise the accused of his rights, as was done by the officer in *Bradshaw*, and not to provide an answer, in the absence of such warnings, that police should know is reasonably likely to elicit an incriminating response." *Olivera*, 164 Ill. 2d at 392. The supreme court then concluded by saying that it held "that the defendant did not initiate the conversation in a manner evincing a willingness and desire for a generalized discussion concerning the investigation." *Olivera*, 164 Ill. 2d at 392.

The lesson to be taken from the discussion in *Olivera* is not immediately clear. The statements beginning and ending the supreme court's analysis on this issue—at the outset, it emphatically deemed any argument that the defendant meant to open a conversation to be a "perversion" of *Edwards*, and, at the conclusion, it stated that the defendant did not initiate a conversation—standing alone indicate a clear holding that the defendant's "What happened?" question did not amount to an initiation of discussion about the case. *Olivera*, 164 Ill. 2d at 391. However, the language that intervenes those two statements indicates exactly the opposite. That language distinguishes *Bradshaw*—a case in which a Supreme Court plurality held the question "What is going to happen to me now?" to be an initiation of conversation about the case—by pivoting to an analysis of what police actions are allowed following a question that does evince a desire to discuss the investigation. This language therefore brings *Olivera* into harmony with *Bradshaw* by assuming that the defendants' questions in both cases evinced a desire to discuss the investigations.

The importance of the police conduct following a defendant's question is also not immediately clear from the *Olivera* analysis. In discussing the police response to the defendant's question, the *Olivera* court relied strongly on the idea that the police action was improper because it was "interrogation" as that term has been used in *Miranda* case law. See *Olivera*, 164 Ill. 2d at 391-92. This passage can therefore be read to imply the view that police conduct does not "initiate" a conversation about a case (or a defendant's statement) unless it actually amounts to interrogation or its functional equivalent (see also *People v. Enoch*, 122 Ill. 2d 176, 193-94 (1988) (applying the "interrogation" test to determine if police initiated a conversation with the defendant after he invoked *Miranda*)), a view that is not unique but is also not universal. See W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §6.9(f), at 845-47 (3d ed. 2007) (citing cases that agree with this approach as well as cases taking a different approach, but implying that *Enoch* falls within the latter category). The passage can also be read to imply a requirement that, "when a defendant asks a question, the answer to which may elicit an incriminating response, the police must first remind the defendant of his right to have counsel present during questioning." *Olivera*, 164 Ill. 2d at 398 (Bilandic, C.J., concurring in part and dissenting in part, joined by Heiple, J.) (characterizing majority opinion).

In the case at hand, the State offers that defendant's inquiry about his car evinced his willingness to speak about the investigation without counsel present. We agree. Under the test from *Bradshaw*, defendant's question about his car far exceeded any inquiry into the "incidents of the custodial relationship." Defendant did not ask about the status of his car or when it might be returned, both questions that could be considered related to the custodial relationship and not the investigation.[4] Instead, he asked police why they had taken the car. Thus, he asked police to give reasons for their postarrest actions that were unrelated to the custodial elements of his arrest or his immediate well-being. The only way police could explain their reasons for taking the car was by describing the scope of their investigation and how the car fell within it. Further, by asking why police had taken his car, defendant implied a belief that his car was not related to the alleged crime, an assertion that, if answered, could be met only with a recitation of the reasons police thought the car useful to their investigation.

The dissent takes a different view of defendant's question to Nelson. Although the record indicates that defendant asked either why

---

[4]Of course answering even those questions might have led to a discussion about the investigation.

his car had been towed or what was going to happen to his car, and, under the governing standards described above, we must assume that he asked why his car had been towed, the dissent obscures this point by relying on the idea that defendant asked only "what happened to [his] car" (393 Ill. App. 3d at 1073). Based on its recharacterization of defendant's question, the dissent concludes that defendant's question did not pertain to the investigation. However, the dissent later says that, if defendant had persisted after his initial question "with questions about why, *** such questions would be viewed more akin to an attempt to initiate conversation about the *** investigation." 393 Ill. App. 3d at 1073. We agree with this portion of the dissent. Since the record indicates that defendant did ask "why," we conclude that he broached the topic of the investigation.

Since we deem defendant's question about his car an initiation of a conversation about his case, there remains no question that Nelson's response was entirely appropriate. As noted, our supreme court stated in *Olivera*, "[i]f a question by an accused who has invoked his right to the presence of counsel during custodial investigation is to be deemed an initiation of a conversation in a manner evincing a willingness and a desire for a generalized discussion concerning the investigation, the proper response to such a question must be to advise the accused of his rights *** and not to provide an answer, in the absence of such warnings, that police should know is reasonably likely to elicit an incriminating response." *Olivera*, 164 Ill. 2d at 392. Nelson did just that when, in response to defendant's question, he avoided giving an answer, which Nelson knew would have opened a discussion about the investigation, without first reminding defendant of his right to counsel.

Defendant disputes any interpretation of his question as initiating a conversation about the case by arguing that, by its decision in *Olivera*, the supreme court mandated a more restrictive reading of suspects' statements following their invocation of their *Miranda* rights. Defendant contends that there is no meaningful way to distinguish the willingness to speak evinced by his question from the willingness evinced by the defendant's question in *Olivera*.

We conclude that, to the extent that *Olivera* can be read to foreclose the State's argument that defendant's question about his car may be understood as an invitation to discuss the case generally, it nevertheless leaves open the idea that defendant ultimately provided the impetus for such a discussion. Even if defendant understood his question to be routine, police could not answer the question without broaching the subject of the investigation. What should an officer do in that situation? By answering the question, the officer runs the risk that the answer would be viewed as the impetus for an ensuing

conversation about the case. However, the officer's ignoring defendant and refusing to answer the question is no better an option. Nelson's response here—telling defendant that, if defendant was going to ask questions, Nelson would need to remind defendant of his *Miranda* rights—was a reasonable third choice. In fact, it seems to be the very approach the majority in *Olivera* envisioned. See *Olivera*, 164 Ill. 2d at 398 (Bilandic, C.J., concurring in part and dissenting in part, joined by Heiple, J.) ("The majority states that, when a defendant asks a question, the answer to which may elicit an incriminating response, the police must first remind the defendant of his right to have counsel present during questioning").

If, as defendant argues, his question about his car was not "a statement that evince[d] a 'willingness and a desire for a generalized discussion about the investigation' " (*Woolley*, 178 Ill. 2d at 198, quoting *Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835 (plurality op.)), it at least evinced a willingness and a desire to enter into a discussion about the car. Nelson's response continued the conversation about the car and followed logically from defendant's question. Nelson's response did mention the matter of representation, but it cannot be said to have "implicitly introduced the subject of further questioning [by initiating] a discussion concerning the matter of representation" (*Trotter*, 254 Ill. App. 3d at 524), because defendant had already introduced the matter with his question, even if he did so inadvertently. Nelson's response also did not rise to the level of an act of "interrogation" or its functional equivalent, because it was not reasonably likely to elicit an incriminating response. See *Olivera*, 164 Ill. 2d at 391. In fact, Nelson's response seems designed to avoid eliciting an incriminating response: rather than goading a statement from defendant, Nelson reminded defendant of his right to refrain from speaking without the aid of counsel.[5] Therefore, even if defendant's question cannot be understood as opening the door to discussion about the case, we conclude that Nelson's response did not escalate the interaction to a more coercive level than defendant's question allowed.

After Nelson's warning, as we have said, defendant unquestionably invited discussion about the case, either by making an unsolicited inculpatory statement or by asking about the permissible scope of

[5]Although they were designed as prophylactic measures, *Miranda* warnings can themselves be coercive, and thus be deemed the impetus for a conversation about an investigation, in some contexts. See, *e.g.*, *People v. Baker*, 253 Ill. App. 3d 15, 35 (1993) (officers took the defendant to an interview room and reread his *Miranda* rights to him). However, in the context presented here, Nelson's warning was prophylactic, not coercive.

questioning in the conversation that ensued. Defendant thus provided the "impetus" both for the conversation itself and for the conversation's being steered to the topic of the investigation generally.

■ Based on the above discussion, then, we conclude that defendant invited discussion about his case when he asked Nelson to relay the reason police had towed his car. Further, even if defendant's question did not invite such a discussion, we conclude that defendant still provided the impetus for the eventual conversation about the case. Accordingly, we conclude that the State met the *threshold* under *Edwards* for admission of defendant's statements. As noted, however, an effective waiver under *Edwards* requires not only that the accused initiate further discussion, but also that the totality of the circumstances show that the right to have counsel present was waived knowingly and intelligently. The trial court's erroneous conclusion that the State failed to meet its burden on the threshold question—initiation—made it unnecessary for the trial court: (1) to apply the totality-of-the-circumstances test or (2) to receive evidence from defendant. The State acknowledges that it is necessary to remand for further proceedings on defendant's motion. On remand, the trial court should first determine whether the State met its burden of showing that, under the totality of the circumstances, defendant "knowingly and intelligently waived his right to the presence of counsel during questioning." *Woolley*, 178 Ill. 2d at 199. If the trial court concludes that the State failed to meet this burden, defendant's motion must be granted. If the State did meet its burden, the hearing should proceed to defendant's case-in-chief.

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed and the cause is remanded for further proceedings consistent with this order.

Reversed and remanded with directions.

BOWMAN, J., concurs.

JUSTICE HUTCHINSON, dissenting:

I do not agree with the majority that defendant's question about why his car was towed signaled his desire to initiate further conversation with the police after his right to counsel had been invoked.

The majority understands that the law to be taken from *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983), is "the Supreme Court's use of the word 'general' in this context to mark a distinction between questions not pertaining to the investigation (such as questions limited to the incidents of the custodial

relationship) and those pertaining to the investigation, specific or not." 393 Ill. App. 3d at 1067. I do not disagree with that understanding. I do, however, disagree that defendant's concern about his car, especially when he was apparently speaking with his father on the phone from the jail, was a question pertaining to the investigation.

A question about personal property involved in an arrest and incarceration is just that. Here, defendant found himself in custody, his car was apparently towed upon his arrest, and his father wanted to know what happened to the car and why it was towed. In fact, the pivotal question in this case appears to be a question posed by defendant's father rather than defendant himself. To my knowledge, there is no applicable law that would allow questioning after a defendant invokes his right to counsel when the question is instigated by a third party.

The conversation between defendant and the officer that follows complicates this situation. The officer testified that he told defendant that he could not answer any questions for defendant unless he read defendant his *Miranda* rights. Defendant then asked, "[D]o I have to answer everything?" This question certainly evinces equivocation and reluctance on behalf of defendant. Defendant was truly "between a rock and a hard place." His father wanted to know what happened to defendant's car, and the officer said he could not answer any questions until the *Miranda* warnings were again presented. I acknowledge that the officer was placed in a difficult position when defendant asked the question, but if the question was properly interpreted as one from a person or persons concerned about some valuable personal property, the answer was simple: it is part of the investigation. If defendant persisted at that point with questions about why, where, or what, such questions would be viewed more akin to an attempt to initiate conversation about the ultimate investigation.

Finally, to make this case most difficult, the officer involved in the phone-question exchange testified he was unsure whether the inculpatory statement "it wasn't a hate crime" occurred before or after the *Miranda* rights were reread and acknowledged by defendant. If the two initial questions posed by defendant to the officer are appropriately interpreted as general inquiries about apparently confiscated personal property, defendant is still under the protection of his invocation of counsel. The blurted statement is not admissible. If the *Miranda* warnings had already been read, the waters become more murky, but that proposition is not before this court at this time.

Accordingly, I respectfully dissent.