2020 IL App (1st) 180235-U

No. 1-18-0235

Second Division
September 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 14 CR 16780 |
| v. | ) | |
| | ) | |
| MEIKO BUCHANAN, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant, | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction and sentence is affirmed where the trial court did not err in denying defendant's motion to suppress, defense counsel did not render ineffective assistance, and defendant's sentence was not excessive. The cause is remanded to the trial court so that defendant may file a motion to correct the mittimus.

¶ 2    Following a jury trial, defendant Meiko Buchanan was convicted of first degree murder and sentenced to 45 years in prison, including a mandatory 15-year firearm enhancement. He now

appeals, arguing that the trial court erred in denying his motion to suppress incriminating statements he made to police after he had invoked his right to counsel. Defendant also contends that his trial counsel was ineffective for failing to seek the redaction of certain statements made by police during his taped interrogation and for eliciting and failing to object to hearsay testimony that he had been identified by a co-defendant. Defendant further asserts that his sentence was excessive and that the mittimus should be corrected to reflect that he was convicted of just one count of murder rather than two. For the following reasons, we affirm defendant's conviction and sentence, but remand so that he may file a motion to correct the mittimus in the trial court.

¶ 3                                    I. BACKGROUND

¶ 4     On September 19, 2014, defendant, Michael Mays, and Sakhee Hardy-Johnson were charged with first degree murder in the September 2013 shooting of 17-year-old Leonard Anderson, an aspiring rapper who performed under the stage name L'A Capone.[1]

¶ 5     Prior to trial, defendant filed a motion to suppress his inculpatory post-arrest statements to police on the grounds that he was not given adequate *Miranda* warnings and that the police continued to question him after he requested an attorney. Attached to the motion was an affidavit in which defendant averred that detectives denied his request to make a phone call, told him that he "did not need an attorney," and promised him that he would not be charged with the murder if he "cooperated with them and gave up the attorney idea."

¶ 6     At the suppression hearing, Detective John Halloran testified that on August 22, 2014, defendant was brought to Area Central from the Cook County jail, where he was being held on unrelated charges. Just after 4 p.m. that day, Halloran and Detective John Murray read defendant

---

[1] Mays and Hardy-Johnson were also convicted of Anderson's murder. They are not parties to this appeal.

his *Miranda* rights and had a conversation with him. The detectives ended the conversation and left the interview room at approximately 4:37 p.m. because defendant stated that he wanted to speak to an attorney. At that time, defendant also requested cigarettes and water.

¶ 7    Halloran did not have any further interaction with defendant until around 8:45 p.m., when he, Murray, and Detective David Hickey transported defendant to the downstairs lockup to be fingerprinted and photographed. Halloran testified that defendant "hesitated and balked" when he was told he would be booked for Anderson's murder and "indicated that he wanted to continue to talk to us." As the detectives transported defendant back to the interview room after booking, defendant was "very nervous and talkative" and again stated that he wanted to talk to the detectives. Once they arrived back at the interview room, Murray read defendant his *Miranda* rights and the detectives had another conversation with him. Halloran denied telling defendant that he would "go to jail for a long time" if he insisted on having an attorney or that he would not be charged if he "gave up the attorney idea" and admitted to being present during the murder.

¶ 8    Detective Kristi Battalini testified that she went to the interview room at around 4:41 p.m. in order to deliver the cigarette that defendant requested from Halloran and Murray. As she was closing the door to leave, defendant stated that he wanted to talk to her. She replied that she was busy with other aspects of the investigation but could come back later. Battalini returned around 8:03 p.m., read defendant his *Miranda* rights, and asked if he still wanted to talk. Defendant stated that he did, and he and Battalini then had a conversation. At some point, defendant asked to make a phone call, which Battalini testified she denied because she "didn't want him to call anyone involved in the investigation." Defendant did not mention wanting to use the phone call to procure an attorney. Battalini denied discouraging defendant from getting an attorney or promising him that he could go home if he told her that he was present during the murder.

¶ 9        The court also viewed the video recordings of defendant's interrogation, which essentially corroborated the detectives' testimony about what occurred in the interview room. Relevant to the motion to suppress, the video showed that after about 30 minutes into his initial interview with Halloran and Murray, defendant stated, "I wanna talk to a lawyer." Halloran immediately ended the interview, stating, "Now we're done talkin' to you and you get a chance to talk to a lawyer, okay?" Murray then stated, "When you get your lawyer, *** tell him about what this conversation that we had and tell him what you want to tell, and maybe he'll get a hold of us. Okay, 'cause there's no lawyer in the world that's gonna sit in this room and tell ya—sit with you to have you talk." When defendant asked when he would get to see his attorney, Murray responded, "That's when you go back over there," presumably meaning when defendant returned to the Cook County jail.

¶ 10        During closing argument, defense counsel maintained that defendant was given inadequate *Miranda* warnings and that Battalini violated defendant's right to counsel by questioning him after he asked to speak to an attorney during his interview with Halloran and Murray. The State responded that the *Miranda* warnings were sufficient, and that defendant waived his right by re-initiating the conversation when Battalini delivered him a cigarette.

¶ 11        The court denied defendant's motion, finding that he was given adequate *Miranda* warnings three times before making the inculpatory statements, and that he re-initiated the discussions by stating that he wanted to speak to Battalini. The court also found that none of the detectives made any improper promise or threats in exchange for defendant's statements.

¶ 12        The case proceeded to trial, where defendant was tried by a jury while Mays was tried simultaneously by the bench. There, Murray testified consistently with Halloran's testimony at the suppression hearing. Murray stated that defendant was brought to Area Central on August 22,

2014, where he was first questioned by Murray and Halloran at around 4:08 p.m. The detectives read defendant his *Miranda* rights and he agreed to speak to them. The detectives ended the conversation after about 30 minutes because defendant stated he wanted to speak to an attorney.

¶ 13    During Murray's testimony, the State also played two video clips from this initial interview. In the first clip, Halloran and Murray informed defendant that they wanted to ask him some questions because they were investigating a shooting and defendant's "name came up as being on the scene." The detectives then read defendant his *Miranda* rights and he agreed to speak to them.

¶ 14    In the second clip, defendant stated that he knew Mays, Hardy-Johnson, and Amanda Fitch, who was murdered in November 2013. He also knew of Anderson and that he was killed in a shooting. Halloran told defendant that he knew defendant was present when Anderson was murdered but was not the "trigger man." Defendant identified photographs of Mays, Hardy-Johnson, Fitch, and Anderson.

¶ 15    Battalini also testified consistently with her suppression hearing testimony. She stated that at around 4:45 p.m., Halloran and Murray informed her that defendant had "lawyered up" and requested a cigarette. Battalini brought defendant a cigarette and, as she went to leave, he stated that he wanted to talk to her. Battalini told him that she was busy with the investigation but could come back later. When she returned at about 8 p.m., she read defendant his *Miranda* rights and he stated that he still wanted to talk. Battalini proceeded to question defendant, who denied being at the murder scene or borrowing Damun Williams' Ford Taurus on the day of the murder. Battalini testified that defendant never asked for a lawyer during this conversation and that she would have stopped questioning him if he had done so. Defendant was given food and water and allowed to use the restroom.

¶ 16    The State again played a video clip of this interview for the jury. The clip showed that Battalini and another detective told defendant several times that they did not believe he was not present for the murder because it was inconsistent with what other people had told them. However, defendant repeatedly denied any involvement and instead claimed that he heard on "the streets" that Fitch killed Anderson.

¶ 17    Halloran testified that he spoke to Mays as part of the investigation of Anderson's murder. After speaking to Mays, Halloran wanted to talk to defendant, which he did when defendant was brought to Area Central on August 22, 2014. Halloran and Murray interviewed defendant at Area Central until defendant requested an attorney. Halloran next saw defendant when he and other detectives escorted him from the interview room to the lockup for booking. Halloran testified that defendant "became nervous and afraid and very animated" when he realized he was being booked for the murder and yelled that he wanted to talk to the detectives. Defendant again stated that he wanted to talk when the detectives retrieved him from the lockup and brought him back to the interview room. However, Halloran testified that he had no substantive conversations with defendant until they arrived back to the interview room. Halloran denied making any promises or threats or telling defendant that he "would go to jail for a long time" if he insisted on having an attorney.

¶ 18    The State played a final video clip of the interview that occurred once defendant was brought back to the interview room. In that clip, defendant was read his *Miranda* rights, which he indicated that he understood. Defendant then told the detectives that he was at a barbeque on the day of the murder when Mays told him that Anderson was at a local recording studio. Mays stated that he planned to kill Anderson and asked defendant to drive the "trail car," which defendant explained is meant to block the police from the car that contains the murder weapon. Defendant

agreed, and borrowed Williams' Taurus. They then drove to the studio, with Fitch and Hardy-Johnson in the lead car and defendant and Mays trailing in the Taurus. Once there, they waited until Anderson and another man emerged from the studio. When Anderson did so, Hardy-Johnson exited the car and shot Anderson. Hardy-Johnson then got back in the car and they drove away.

¶ 19    The State rested, and the defense called Williams. Williams testified that he used to lend his cars to defendant and others. However, Williams stopped doing so in the summer of 2013 because one of his friends crashed his car and refused to pay for the damages. Williams stated that he did not let defendant borrow his Taurus on the day of Anderson's murder.

¶ 20    Defendant testified that he was at a barbeque on the day of the murder and never went to the recording studio. He also denied driving Williams' Taurus on that day. Defendant further testified that, as he was being taken to the lockup for booking, Halloran told him that the police knew he was not present during the murder. Halloran also told defendant that he would not be charged if he agreed to say that he drove the trail car and saw Hardy-Johnson shoot Anderson. Defendant testified that he falsely told police that he drove the trail car because he wanted to go home to his young son. On cross-examination, defendant acknowledged that he was "willing to get into a courtroom, sit in front of a Court, and lie about what happened" in order to avoid jail time.

¶ 21    In rebuttal, the State called Hickey, who testified that he escorted defendant to and from the lockup alongside Halloran and Murray. Hickey stated that nobody was ever alone with defendant throughout the booking process, and that no one made defendant any threats or promises in exchange for a statement.

¶ 22    In closing arguments, the State argued that defendant was legally accountable for Anderson's murder because he knowingly drove the trail car.

¶ 23    The defense argued that defendant was not at the murder scene and only confessed to driving the trail car because he would have said anything to avoid going to jail. Defense counsel also attacked the detectives' conduct in interrogating defendant, stating that "[t]hey kept yelling at him" and refused to listen when defendant initially stated that he was not involved. At other times throughout his closing argument, defense counsel characterized the detectives' behavior as "berating" defendant, "leaning over him," "screaming at him," and "bull[ying]" him. Defense counsel also rhetorically asked the jury whether the detectives "seem[ed] respectful to you or did they seem like sociopaths?"[2]

¶ 24    After deliberation, the jury found defendant guilty of first degree murder. The jury also found that defendant or someone for whom he was legally responsible was armed with a firearm during the offense.

¶ 25    The defense filed a motion for a new trial, arguing that (1) defendant was not proven guilty beyond a reasonable doubt, (2) the court erred in denying defendant's motion to suppress, and (3) there was "newly discovered evidence" in the form of a statement from Jemeri Boddy, the man who exited the recording studio with Anderson just before the murder. At the hearing on the motion, Boddy testified that he saw someone walk up and shoot Anderson, but that he was "not sure" who it was or whether it was a man or a woman. Boddy acknowledged signing a statement for defense counsel that stated he saw Fitch shoot Anderson. However, Boddy testified that he signed the statement without reading it. The court denied defendant's motion for a new trial.

¶ 26    The case proceeded to a sentencing hearing, where the trial court acknowledged receipt of defendant's presentence investigation report. In aggravation, the State entered a certified copy of

---

[2] The trial court sustained the State's objection to this comment.

defendant's 2008 conviction for aggravated robbery, for which he received 30 months' probation. The State also called Anderson's mother and uncle, who read their respective victim impact statements into the record. Finally, the State called Chicago police officer Farias,[3] who testified to the circumstances of the case for which defendant was originally held in the Cook County jail at the time he was interrogated in the present case. Farias stated that in March 2014 he and his partner responded to a call about a man with a gun in a silver Nissan. The officers located the Nissan and activated their emergency lights. The Nissan made a turn and "sideswiped" a parked vehicle before coming to a stop. Defendant then exited the driver's seat of the Nissan holding a black handgun. He tossed the gun onto the driver's seat and ran. The officers recovered the gun, which was loaded, and gave chase. When they caught up to defendant, he resisted arrest but was eventually taken down and handcuffed.

¶ 27    Based on this evidence, the State argued that defendant should be sentenced to "well above the minimum" because he was already a felon at the time of Anderson's murder and "didn't turn his life around" after the murder, as he was caught with a firearm approximately six months later.

¶ 28    In allocution, defendant stated that he joined a gang and started "hanging with the wrong people" as a young man to fill the void left by his father's death. Since being incarcerated, defendant had "grown a stronger relationship with God" and earned a certificate for memorizing passages from the Bible. Defendant requested the minimum sentence so that he could be reunited with his six-year-old son.

¶ 29    In mitigation, defense counsel argued that defendant should receive the minimum sentence in light of his young age and limited role in the murder.

---

[3] The transcript does not contain Farias' first name.

¶ 30 In announcing the sentence, the trial court opined that neither the minimum nor the maximum sentence was warranted in this case. The court also stated that defendant was part of a plan to "execute" Anderson for "no reason," and that defendant had "chosen a lifestyle that did not contribute one single thing to society, but actually caused and inflicted pain on various individuals." Accordingly, the court sentenced defendant to 30 years in prison for the murder with an additional 15-year enhancement based on the jury's finding that someone for whom defendant was legally responsible was armed with a firearm.

¶ 31                                    II. ANALYSIS

¶ 32                              A. Motion to Suppress

¶ 33 On appeal, defendant first argues that the trial court erred in failing to suppress his inculpatory statements to police where they were made after he invoked his right to counsel. When reviewing a trial court's ruling on a motion to suppress, we apply a two-part standard of review. *People v. Eubanks*, 2019 IL 123525, ¶ 33. We will disturb the trial court's factual findings only if they are against the manifest weight of the evidence. *Id.* However, we review the court's ultimate legal ruling on whether the evidence should be suppressed *de novo*. *Id.*

¶ 34 In *Miranda v. Arizona*, 384 U.S. 436, 469 (1966), the United States Supreme Court held that an accused is entitled to have counsel present during custodial interrogation as a safeguard to the fifth amendment privilege against self-incrimination. *People v. Miller*, 393 Ill. App. 3d 1060, 1064 (2009). In *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), the Supreme Court further held that when an accused invokes his right to counsel during interrogation, the police must immediately cease questioning unless and until "the accused himself initiates further communication, exchanges, or conversations with the police." If the police initiate a subsequent conversation without counsel present, the accused's statements are presumed involuntary and are

inadmissible as substantive evidence. *People v. Woolley*, 178 Ill. 2d 175, 198 (1997). Moreover, any waiver of the right to counsel given in a police-initiated discussion is presumed invalid. *Id.* The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

¶ 35    Determining the admissibility of a defendant's statements made after he has invoked his right to counsel involves a two-part inquiry. *Woolley*, 178 Ill. 2d at 198. First, the court must determine whether the defendant, rather than the police, initiated the further conversation. *Id.* The defendant will be deemed to have initiated the conversation if he makes a "statement that evinces a 'willingness and a desire for a generalized discussion about the investigation.' " *Id.* (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)). If the defendant did in fact initiate the conversation, the second inquiry is "whether the totality of the circumstances, including the fact that the accused reopened dialogue with the police, shows that the accused knowingly and intelligently waived his right to the presence of counsel during questioning." *Id.* at 199.

¶ 36    Here, defendant does not dispute that he re-initiated conversation with the police after invoking his right to counsel. Rather, defendant argues only that his waiver was not knowing and voluntary under the totality of the circumstances because "the detectives' lie that the only attorney that could represent him was the public defender that was assigned to his other case and the detectives['] refusal to allow him a phone call gave him the erroneous impression that counsel could not be made available then or in the near future."

¶ 37    However, we find that, on balance, the majority of the relevant factors weigh in favor of a finding that defendant's waiver was knowing and voluntary. First, the record shows that defendant was clearly aware of his right to remain silent and his right to counsel, as he was read his *Miranda* rights multiple times while at Area Central, including immediately after he stated that he wanted

to waive his right to counsel. See *People v. Starnes*, 273 Ill. App. 3d 476, 483 (1995) (stating that, although not necessarily required, it "would be good public policy" for the police to restate a defendant's *Miranda* rights whenever the defendant reinitiates a conversation after invoking his right to counsel). Defendant was 23 years old and had significant experience with law enforcement, having been previously convicted of a felony and in custody for a different offense at the time of questioning. Although defendant contends that the detectives discouraged him from insisting on an attorney, the record shows that the detectives scrupulously complied with the requirement that they cease questioning once defendant requested an attorney and repeatedly told him that they could not talk to him until he saw an attorney. The trial court also found that the detectives did not make any threats or promises in exchange for defendant waiving his right to counsel, a finding which defendant does not challenge on appeal and which was not against the manifest weight of the evidence. See *People v. Outlaw*, 388 Ill. App. 3d 1072, 1086 (2009) (no *Edwards* violation where the defendant understood his rights and the police did not make any threats or promises). The record further shows that defendant was given food, water, and cigarettes while in custody and was allowed to use the restroom. There is no evidence or allegation of physical abuse. *People v. Mandoline*, 2017 IL App (2d) 150511, ¶¶ 121, 130 (no *Edwards* violation where the defendant was 23 years old, allowed to smoke and use the restroom, not physically abused, understood his *Miranda* rights, and, although initially led to believe he would not be able to speak to a lawyer, he was eventually informed that his right to counsel would be honored). These factors weigh heavily in favor of a finding that defendant knowingly and intelligently waived his right to have counsel during questioning.

¶ 38    Nevertheless, defendant maintains that his waiver was not voluntary in part because he was not allowed to make a phone call while at Area Central. Defendant also contends that the detectives

violated section 103-3 of the Code of Criminal Procedure, which provides that an arrestee "shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls *** within a reasonable time after arrival at the first place of custody." 725 ILCS 5/103-3 (West 2014). The purpose of section 103-3 is to permit an accused "to notify his family of his whereabout and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel, and other procedural safeguards that the defendant cannot accomplish for himself while in custody." *People v. Prim*, 53 Ill. 2d 62, 69-70 (1972). However, we note that the statute contains no remedy, and that this court has found no error where, as here, the defendant did not indicate that he wanted a phone call specifically to enlist legal representation. See *People v. Williams*, 2017 IL App (1st) 142733, ¶ 30. Instead, this court has considered the denial of a phone call to an accused to be merely one factor in whether a statement was voluntary under the totality of the circumstances. *Id.*; *People v. Green*, 2014 IL App (3d) 129522, ¶ 58; see also *Mandoline*, 2017 IL App (2d) 150511, ¶ 23 (waiver voluntary despite police denying the defendant's request to make a phone call to procure legal representation). Notwithstanding the lack of a phone call, the factors described above warrant a finding that defendant's waiver was knowing and voluntary.

¶ 39 Another factor that defendant argues rendered his waiver involuntary was the detectives' statements that he would have to use the same public defender assigned to his other case and that he would not be able to speak to that public defender until he was returned to the Cook County jail. Although at least the first statement was inaccurate, we do not agree with defendant's contention that the statements would lead a reasonable person to believe his right to counsel would not be honored. As previously explained, the record shows that the detectives in this case repeatedly told defendant that he had the right to counsel and that they would not speak to him

until he got an attorney. Although we are aware of no published case directly on point, this situation is somewhat similar to those in which the police inform a defendant who has invoked his right to counsel that it would be some indeterminate amount of time until they could speak to an attorney. For example, in *People v. Fayne*, 283 Ill. App. 3d 382, 385 (1996), the defendant asked when he would get to see a lawyer, and the police responded that they would call the public defender's office but that "they probably will not come" unless the public defender had been assigned to the case. The defendant then re-initiated a conversation and eventually made incriminating statements. *Id.* at 385-87. This court found no *Edwards* violation based on the totality of the circumstances, stating that the police merely informed the defendant that "the public defender's office might not be immediately available and that he would mostly likely have to wait for a public defender," a fact of which the defendant was "certainly well aware" given his history with the criminal justice system. *Id.* at 393. Here, as in *Fayne*, the detectives' statements essentially informed defendant that he had the right to have an attorney present but that he would have to wait for one as a practical matter. Although we do not condone the inaccuracy of the challenged statements, we find nothing about them to be coercive or indicative that defendant's right to counsel would not be fully honored.

¶ 40    Additionally, the timeline of defendant's interrogation undercuts his argument. Specifically, defendant first re-initiated conversation with Battalini just 10 minutes after invoking his right to counsel. Defendant thereafter never requested an attorney again and eventually made incriminating statements sometime after 9 p.m., at which point he had been at Area Central for a total of approximately 5½ hours and questioned in three separate interviews of less than 30 minutes each. See *Mandoline*, 2017 IL App (2d) 150511, ¶ 118 (finding that the defendant re-initiated discussion with police and knowingly and voluntarily gave an incriminating statement where he

had been in custody for around four hours and questioned for the "relatively brief" period of about three hours). Under the totality of these circumstances, we conclude that defendant knowingly and intelligently waived his right to counsel.

¶ 41    Defendant also argues that his statements should have been suppressed because the detectives denied him access to an attorney in violation of the Illinois Constitution. In so arguing, defendant relies exclusively on *People v. McCauley*, 163 Ill. 2d 414, (1994), where the defendant's attorney appeared at the police station as defendant was being questioned, but the police refused to allow the attorney to see the defendant and refused to tell the defendant that the attorney was present. However, this case is readily distinguishable from *McCauley*, as there is nothing in the record to indicate that counsel for defendant was present at Area Central or otherwise imminently available. Moreover, the fact that defendant had been appointed a public defender in his unrelated cases did not obligate the police to contact that attorney before questioning. *Outlaw*, 388 Ill. App. 3d at 1082-83 (2009). In any event, the record in this case shows that the detectives stopped questioning defendant and informed him that he would be able to speak to an attorney as soon as he returned to the Cook County jail. Thus, defendant's due process rights were not violated, and the trial court did not err in denying his motion to suppress.

¶ 42                    B. Ineffective Assistance of Counsel

¶ 43    Defendant next argues that his trial counsel was ineffective for (1) failing to seek additional redaction of the interrogation videos, and (2) "failing to object to and for eliciting inadmissible hearsay identification testimony at trial."

¶ 44    Claims of ineffective assistance of counsel are analyzed under the two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Jackson*, 2020 IL 124112, ¶ 90. Under *Strickland*, a defendant alleging ineffective assistance of counsel must show that (1)

counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that the result of the proceeding would have been different but for counsel's performance. *Id.* To establish that counsel's performance was deficient, a defendant must overcome the strong presumption that the challenged actions or inactions were the product of sound trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44. Matters of strategy are "generally immune from claims of ineffective assistance of counsel." *Id.* "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 80.

¶ 45                    1. Redaction of the Interrogation Videos

¶ 46    We first address defendant's claim that trial counsel was ineffective for failing to seek further redaction of his taped interviews. Specifically, defendant challenges the inclusion of the detectives' statements that they did not believe him when he denied being at the murder scene because of what they were told by others. Defendant contends that allowing these statements was unreasonable and prejudicial because it enabled the State to bolster a "weak" case with the detectives' personal opinions that non-testifying witnesses who implicated defendant were more credible. However, we disagree with defendant's characterization of the case. Instead, we find that trial counsel was attempting to mitigate the strong impact of defendant's taped confession. As defendant acknowledges, the key issue for the jury to decide in this case was whether to credit the confession or defendant's testimony that it was coerced. Accordingly, the record clearly shows that counsel's strategy was to attack both the detectives' credibility and their interrogation tactics. As is evident from closing argument, it was part of that strategy to show the jury the fuller context of defendant's interviews to argue that they showed the detectives "bullying" him into a false

confession by refusing to accept his claims of innocence. Although this strategy ultimately proved unsuccessful, we cannot say that it was unreasonable. See *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28 ("The mere fact that an 'all-or-nothing' strategy proved unsuccessful does not mean counsel performed unreasonably or rendered ineffective assistance."). At the very least, counsel's strategy provided some explanation as to why defendant first denied any involvement in the murder and then decided to confess. Without the full video, defendant's claim that he was coerced into confessing is far less persuasive. Under these circumstances, we cannot say that counsel's performance was deficient. Consequently, defendant's claim of ineffective assistance of counsel fails. *People v. Cherry*, 2016 IL 118728, ¶ 31 (the failure to establish either *Strickland* prong precludes a finding of ineffective assistance of counsel).

¶ 47                                    2. Identification Testimony

¶ 48    Defendant also argues that counsel was ineffective for failing to object to what he claims was hearsay identification testimony. In particular, he takes issue with the following exchange from Halloran's testimony:

"Q. Now, specifically I want to direct your attention to August 22nd, 2014, or a little bit before then. Did you have an opportunity to speak with someone by the name of Michael Mays?

A. I did.

Q. And after speaking with someone by the name of Michael Mays, did you want to speak with anyone else?

A. I wanted to arrest and speak with this Defendant, Meiko Buchanan, seated at the defense table in the light-colored suit."

¶ 49 Despite defendant's assertion that Halloran's statements were "hearsay identification testimony," we note that Halloran did not testify that Mays identified defendant as participating in the murder. Although Halloran's testimony implies Mays implicated defendant in some way, "[t]estimony describing the progress of an investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). The general rule is that "police officers may testify to information they received during the course of an investigation to explain why they arrested a defendant or took other action." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23. Such testimony is not hearsay because it is offered not for the truth of the matter asserted, but only to explain the investigative process. *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 177; see also *Jovan A.*, 2014 IL App (1st) 103835, ¶ 23 (hearsay is defined as "an out-of-court statement offered in court to prove the truth of the matter asserted"). Thus, police testimony about the investigative process is generally admissible so long as it reveals the mere fact of a conversation with a witness rather than its substance. *People v. Gaucho*, 122 Ill. 2d 221, 248 (1988).

¶ 50 Here, Halloran's testimony clearly fell within the course of investigation exception. His statements were limited to the fact that he had a conversation with Mays and thereafter wanted to speak to defendant. Importantly, Halloran did not reveal any details about the substance of his conversation with Mays. The testimony was also certainly relevant to explain how the investigation led to defendant, especially where defendant was not questioned until more than a year after the murder. Thus, Halloran's testimony was admissible and trial counsel was not ineffective for failing to object to it.

¶ 51    Defendant further contends that trial counsel was ineffective for eliciting hearsay identification testimony during his cross-examination of Battalini. Specifically, defendant challenges the following exchange:

"Q. Okay. So you—tell me if I'm wrong—assume that the person who told you that Meiko Buchanan was involved in this homicide, you believed that person, but you didn't believe Mr. Buchanan. Would that be a fair statement?

A. Um, no. Our investigation showed that more credibly, based on my investigation, that that was not the truth.

Q. Oh. Okay. Is there anybody here that you put the credibility on against Mr. Buchanan? Can you give the person a name?

A. That's more credible than—

Q. That—well, apparently, that you thought was more credible than Mr. Buchanan.

A. I believe we spoke with Michael Mays at that time.

Q. Okay. So, is it Michael Mays that you thought, at the time, was more credible than Mr. Buchanan?

A. Based on our investigation, at that time, and everything we had, I believe that Michael Mays was telling the truth at that time."

¶ 52    Defendant argues that this portion of counsel's cross-examination was unreasonable because it allowed Battalini to reveal that the police believed May's account implicating defendant. However, we find counsel's questioning to be part of a larger strategy of attacking the detectives' investigation and credibility. See *Jackson*, 2018 IL App (1st) 150487, ¶ 26 (whether and how to cross-examine a witness is generally a strategic matter that cannot support a claim of ineffective

assistance of counsel). The record shows that the purpose of this line of questioning was two-fold. First, counsel wanted to suggest that the detectives conducted a shoddy investigation by uncritically accepting Mays' account over defendant's because they simply wanted to charge someone—anyone—with the murder. Second, counsel wanted to explain that defendant was only singled out to give a false confession in the first place because of the unreliable word of Mays. Indeed, in arguing that the detectives "concocted" the substance of defendant's confession so that they could claim to have solved the case, counsel noted that "[t]hey didn't even look at [defendant] until *** they talked to Michael Mays, who has his own agenda." Though ultimately unsuccessful, this strategy was reasonable under the circumstances. Accordingly, defendant cannot establish that his counsel was ineffective based on this isolated cross-examination.

¶ 53                                    C. Excessive Sentencing

¶ 54     Defendant next contends that his 45-year sentence was excessive. The Illinois Constitution requires that a criminal sentence "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11; *People v. Rizzo*, 2016 IL 118599, ¶ 28. A trial court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 120. This is in part because the trial court is in the best position to consider relevant factors such as the defendant's credibility, mentality, social environment, age, and general moral character. *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 39. Thus, a reviewing court must not reweigh these factors or substitute its own judgment for that of the trial court merely because it would have weighed them differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Moreover, a sentence is presumed to be proper where it falls within the applicable statutory range. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. A sentence will not be disturbed on appeal absent

an abuse of the trial court's discretion, which occurs where there is "an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *Id.*

¶ 55    Here, defendant was convicted of first degree murder, which carries a sentence of between 20 years and 60 years. 730 ILCS 5/5-4.5-20 (West 2014). Defendant was also subject to a mandatory 15-year firearm enhancement (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2014)), making the applicable sentencing range 35 years to 75 years. Defendant's 45-year sentence is thus well within the statutory range and is therefore presumed proper. Defendant does not dispute that his sentence falls within the applicable range but argues only that his sentence should be reduced to the 35-year minimum in light of his young age and "limited participation" in the murder.

¶ 56    We initially note that, although defendant asserts his age "played no role" in the sentence, the records show that the trial court was well aware that defendant was 23 years old at the time of the offense. Although the court did not specifically mention defendant's age in announcing the sentence, the trial court is presumed to have considered all mitigating evidence and was under no obligation to articulate the weight it assigned to each mitigating factor. *Knox*, 2014 IL App (1st) 120349, ¶ 46. Nor was the court required to weigh the mitigating evidence more heavily than the seriousness of the offense, which is "[t]he most important sentencing factor." *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 24. Although defendant attempts to downplay the seriousness of his conduct by observing that his role was "limited to driving the trail car," we find that the trial court aptly characterized his conduct as participating in a planned "execution" of a 17-year-old with whom he had no apparent personal quarrel. The trial court also properly considered defendant's criminal history as an additional aggravating factor. *Wheeler*, 2019 IL App (4th) 160937, ¶ 42 ("[A] defendant's prior criminal history is an aggravating factor."). Under these circumstances, we

find that the trial court was not required to sentence defendant to the minimum but was rather well within its discretion to impose a sentence of 45 years, which is at the low end of the statutory range.

¶ 57                                    D. Mittimus

¶ 58    Finally, defendant argues, and the State concedes, that the mittimus should be corrected to reflect that he was convicted on one count of murder rather than two. We agree with the parties, as Anderson is the only deceased and "[t]here can be only one murder conviction and one sentence for one count of murder when there was only one death." *People v. Hood*, 191 Ill. App. 3d 129, 134 (1989). The mittimus currently states that defendant was convicted and sentenced on both count I, which alleged intentional killing (720 ILCS 5/9-1(a)(1) (West 2014)), and count II, which alleged murder based on knowledge of a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2014)). As intentional murder is the more serious offense, defendant's sentence on count II should be vacated and the conviction should merge into count I. *People v. Perez*, 2020 IL App (1st) 153629-B, ¶ 47.

¶ 59    However, although the parties ask us to correct the mittimus on our own, we find that the proper remedy under Illinois Supreme Court Rule 472 is to remand to the circuit court so that defendant may file a motion to correct the mittimus there. See Ill. S. Ct. R. 472 (eff. May 17, 2019) ("In all criminal cases pending on appeal as of March 1, 2019" in which a party has raised a clerical error in the mittimus for the first time on appeal, "the reviewing court shall remand to the circuit court to allow the party to file a motion."). Accordingly, we remand to the circuit court for the limited purpose of allowing defendant to file a motion regarding the incorrect mittimus.

¶ 60                                    III. CONCLUSION

¶ 61     Defendant's conviction and sentence is affirmed, and the cause is remanded so that the may

file a motion to correct the mittimus in the circuit court.

¶ 62     Affirmed in part; remanded in part for defendant to challenge the mittimus.